[No. 11135.   Department One.   September 9, 1913.]

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM J.
SHAW, *Appellant.*[1]

CRIMINAL LAW—EVIDENCE—CHARACTER OF ACCUSED—ADMISSIBIL-
ITY.   In a prosecution for murder, in which the accused had not
put his character in issue, it is inadmissible and prejudicial error
to receive in evidence a certificate of his dishonorable discharge from
the United States navy tending to show that the accused had a bad
character.

SAME.   Such certificate is not made admissible by reason of the
fact that the accused, when pressed on cross-examination, admitted
that he had been discharged for bad conduct.

SAME.   Such certificate would not be admissible even if char-
acter had been put in issue, since it was a declaration of third
parties out of court.

SAME—DEFENSE—INSANITY—EVIDENCE—ADMISSIBILITY.   In a pros-
ecution for murder, in which the defense was insanity, a certificate
of discharge from the United States navy reciting that the accused
was physically sound, is not admissible, since it was an *ex parte*
statement not under oath, and its admission violated Const., art. 1,
§ 22, guaranteeing the right to meet witnesses face to face.

HOMICIDE—EVIDENCE—DECLARATIONS OF DECEASED—LETTERS—AD-
MISSIBILITY.   In a prosecution for murder of accused's wife, it is
error to receive in evidence a letter from the wife to her mother
written twenty-seven days before the murder, giving her *ex parte*
statements of the trouble between them, there being in evidence no
correspondence of which this letter formed a part.

CRIMINAL LAW—TRIAL—OBJECTIONS—GENERAL OBJECTIONS TO EVI-
DENCE.   General objections to evidence in a capital case will not be
considered too indefinite, where the evidence was clearly prejudicial
and incompetent for any purpose.

CRIMINAL LAW—INSANITY—INSTRUCTIONS—COMMENT ON FACTS.
Upon the defense of insanity in a murder case, instructions to the
effect that the defense is subject to great abuse and is often resorted
to where there is no other escape from conviction, and should be
carefully scrutinized to see that the facts fully measure up to the
requirements of the law, and that an ingenious counterfeit of mental

[1]Reported in 135 Pac. 20.

irresponsibility is not used to deceive the jury, come near to being an unlawful comment on the evidence in violation of Const., art. 4, § 16.

MOUNT, J., dissents.

Appeal from a judgment of the superior court for Walla Walla county, Brents, J., entered April 22, 1912, upon a trial and conviction of murder in the first degree. Reversed.

*Dunphy, Evans & Garrecht*, for appellant.

*Everett J. Smith*, for respondent.

PARKER, J.—On February 27, 1912, at Walla Walla, the defendant, William J. Shaw, while laboring under some considerable excitement, and evidently believing himself to have been greatly wronged by his wife's desertion of him, induced by one Hudson, a one time friend, shot and killed his wife. He was charged, by information filed in the superior court for Walla Walla county, with the crime of murder in the first degree. He pleaded not guilty, and there was also interposed in his behalf by his counsel the plea that, at the time of shooting his wife, he was mentally irresponsible. He was thereafter tried, found guilty as charged, and his motion for a new trial being denied, he was sentenced to be hanged. From this conviction and sentence, he has appealed to this court.

Appellant is a colored man, about 24 years old. His wife at the time of her decease was about 20 years old. They were married at Seattle, in the year 1910. Her maiden name was Alice Chapman, and prior to her marriage to appellant, she lived with her mother, Mrs. L. M. Chapman, at Franklin, in King county. Soon after their marriage, they moved to La Grande, Oregon, where he worked in a barber shop. While there they became acquainted with one Hudson and his people, who were also colored people. They became friendly with the Hudsons and associated with them considerably. In the early spring of 1912, some misunderstanding arose between appellant and his wife growing out of what he evidently conceived to be her too frequent visits to the Hudsons. Accord-

ing to his story, told on the witness stand, on February 5th she told him that she had received a letter from her mother with money, and that she was going to Franklin where her mother lived. Soon thereafter she left La Grande, appellant supposing she had gone to Franklin. Soon thereafter a letter came to La Grande from her mother addressed to her, which he opened and read, and learned therefrom that her mother had not sent any money. This letter was not offered in evidence, nor was the substance of its contents testified to further than to show that he learned therefrom that his wife had not received money from her mother. This letter was evidently in answer to the letter from his wife to her mother hereinafter quoted. The remainder of his story is best told in his own language, as follows:

"The following Sunday, Hudson came to my place of business, and I noticed a post card in his pocket. I went to take it out to look at it and he said 'don't.' I glanced at it, and saw 'son,' and recognized it as my wife's handwriting. He pushed it back and said 'That is from a man I used to work for in Walla Walla.' He had been here. He said that same day he was going to Salt Lake City, and I said 'Why are you going so sudden?' And he said he was getting lonesome. I began thinking about this letter, and I walked to his place of business, and he was in the bathtub taking a bath. I took the card and read it, and it said: 'Today is Friday, and only one letter from you. Love. B. H.' I recognized it as my wife's writing. Then I began to think what was the best thing I could do to get Hudson prosecuted. Her mother had written that she had not sent her the money, and I formed a conclusion that he had. I spoke to the chief of police about it and told him about it, and asked him what he advised me to do in a case of that kind. He said we could do little there. He said he would advise me to go to Walla Walla. The next morning I was passing by Hudson's shop early, and he called me inside and asked me if I wanted to buy some stuff. I said I would take two cans of that yellow polish. He pulled his drawer open and I noticed he had a big revolver. I said: 'Are you going to sell that too?' He said: 'No, I will take it with me, I will probably need it.' I made up my mind to come to Walla Walla too, and I would see whether he came there or

went to Salt Lake. The next morning I told the boss that
I had seen this card, and I had suspicions that Hudson had
given my wife the money to leave on, and I was going to
Walla Walla to find out whether it was a fact or not, and
to see if I could get him prosecuted. Before I left I bought
a revolver at La Grande, thinking I might have trouble with
Hudson. I came to Pendleton and stayed all night to see
whether Hudson would go this way or go the other way. The
next morning I got up before six o'clock and met a fellow
there named Bob. I had known him in La Grande, and I
asked him to see if Hudson was on the train. He went there
and said Yes, that he was going to Walla Walla. He said
Hudson told him that he was married and had a wife in
Walla Walla and he was coming here. ·  . . . I came on the
rear end. He got off and walked up the street. I let him
walk two or three blocks and then I followed him. He went
into a little house on the side of the street there, and I
watched him, and I went to a house on the corner and inquired
who lived there. A lady came to the door and said, no, he did
not live there, but she knew him last fall, that he had been
around there. I asked her, did she know whether he was mar-
ried, and she said no, but he said he was, he said he had a
wife. I asked her where I would find the police station and
she told me. She said she did not think he had a wife. I
suspicioned that my wife was living as his wife  . . . I
went to a barber shop and asked a colored fellow working
there if he knew a colored lady of that description. He said
yes, her name was Alice Hudson. I said, 'Is she living as
Alice Hudson?' and he said 'Yes.' He said: 'She is expect-
ing her husband in a day or two.' I said: 'Do you know
where she lives or works?' And he said 'No.' He said he
had heard some one say she worked for the prosecuting at-
torney. He said he had heard that. He went to the phone
and look up the prosecuting attorney's office and I rang up,
and he said no. I rang the office, there was no one at the
house. His name was Henry Allen. He said he could find
out, and he rang up a friend of his and she said she was
working for Mrs. Copeland. I went to Mrs. Copeland's,
and she informed me that she had quit, and was working for
Mrs. Sharpstein. I went to Mrs. Sharpstein's door and
Mrs. Sharpstein came to the door, and I said: 'Can I speak
to Alice?' She said: 'All right.' And she called Alice to the

door. I said: 'Alice, I know Hudson gave you money to leave me on, and he came here to live with you, and I am going to prosecute him, and I want you to come back with me.' She said: 'You get right out; I won't have anything to do with you.' I had that pistol, and before I had time to think I fired, and walked towards town, and some one hollered to me and I turned around and saw the chief of police standing there. He took me to the police station."

There were three shots heard by witnesses. One witness, who saw appellant at the time from a distance, testified that,

"He went up on the back porch, and I saw him talking there, and heard two shots fired quick. Then after that he ran down half of the steps, about half way, and then went back and fired a third shot, and he came down around the house."

Mrs. Sharpstein testified to what occurred at the time of the shooting as follows:

"I was getting lunch when some one came around the house and rapped at the door. Alice started to the door, and I was standing about half way between the refrigerator and the door, and I opened the door myself. When I opened the door he stepped almost inside the door, and very close to me, then he looked up and saw who it was and he stepped back and said: 'I would like to speak to the girl.' I said: 'All right.' I did not want to make Alice go out to talk to him, so I went out of the dining room, and I stood with my hand on the door. I thought he would not stay long. I was standing there when I heard a little scream, not very loud. I took about two steps from the door, when he shot, and I took about one step and he shot again. Then I went upstairs and I told my mother what had happened when he fired a third shot."

Mrs. Sharpstein evidently did not hear any conversation between appellant and his wife at that time. Neither she nor any other witness gave any version of that conversation. Appellant's wife died almost instantly upon the shots being fired. She was known in Walla Walla to Mrs. Sharpstein and other witnesses, who testified, as Alice Hudson. There is practically no conflict in the evidence as to what occurred at the

time of the shooting, and we have no testimony other than that of appellant himself as to the conversation which took place at that time between him and his wife. If we assume that appellant was mentally responsible, the evidence furnishes no light touching his motive other than the inference to be drawn from the facts we have above summarized. We have thus noticed the evidence somewhat in detail in so far as it tends to show appellant's controlling motive and to what extent, if any, the killing of his wife was premeditated on his part, to the end that we may better appreciate the prejudicial effect of the claimed errors relied upon by his counsel for a reversal and the awarding of him a new trial.

Upon cross-examination of appellant by counsel for the state, touching appellant's past life and his service in the United States navy, and evidently for the purpose of showing his sound physical and mental condition, and also for the purpose of showing his dishonorable discharge from the navy, counsel for the state offered in evidence a writing purporting to be a discharge of appellant from the navy, reading as follows:

"Discharge.

"This is to certify that William John Shaw a Mess Attendant, third class, has this day been discharged from the U. S. S. Charleston and from the Naval Service, by reason of Sentence of Summary Court Martial, approved September 9, 1907, with bad conduct discharge. Is not recommended for reenlistment. Rating best qualified to fill, None. Dated this 14th day of September, 1907, at Seattle, Washington.

"F. E. Beatty, Commander, U. S. N.,
"Commanding U. S. S. Charleston."

Endorsed in writing in red ink across the face of this paper is the following:

"U. S. S. Charleston, 1st Rate,
"Seattle, Washington.
"September 14, 1907.

"Discharged with Bad Conduct Discharge. Is not recommended for reenlistment.          F. E. Beatty,
"Commander, U. S. Navy, Commanding."

Endorsed on the back of this paper is the following:

"Descriptive List.

(To be made after careful examination at date of discharge.)

Where born, Refugio, Texas; Date, 25 Jan., 1888; Age, 19 years, 7 months; Height, 5 feet, 5¾ inches; Weight, 126 lbs.; Eyes, negro; Hair, negro; Complexion, negro; Personal characteristics, marks, etc., Sl. left varicocele. Scars: rt. shin, lumbar region (2), forehead and l. f. a. Splay feet. Percentage of time on sick list during enlistment, 0. Is physically qualified for reenlistment.

"Edw. U. Reed, Asst. Surg. U. S. N."

This paper was admitted in evidence over the objection of counsel for appellant. This, it is claimed, was error to the prejudice of appellant. So far as the statement of the cause of appellant's discharge and his disqualification for service in the navy, made in the body of this paper and in the indorsement on the face thereof, is concerned, its introduction in evidence manifestly tended to show that appellant had a bad character. Appellant had not put his character or reputation in issue in the slightest degree; so, of course, it follows that his character could not be assailed by evidence introduced by the state. 12 Cyc. 413. It is true that, immediately before the paper was introduced in evidence, appellant, being pressed upon cross-examination, admitted that he had been "discharged for bad conduct," but that did not render the paper admissible, as counsel for the state seems to insist, though it may in some degree furnish some ground for urging that the paper was no more prejudicial in that respect than appellant's admission. However, the admission of a fact by appellant upon cross-examination tending to reflect upon his character manifestly did not put his character in issue and open wide the door for the state to introduce further and more damaging evidence upon such an issue over his counsel's objection. Viewed in this aspect, the paper was clearly inadmissible against appellant.

And even though appellant had voluntarily put his character in issue, this paper would not have been competent

proof tending to show his bad character. In *People v. Eck-man,* 72 Cal. 582, 14 Pac. 359, a similar certificate was sought to be introduced in evidence as tending to show the good character of the defendant. Disposing of the contention of the defendant that its exclusion by the court was error prejudicial to him, the supreme court of that state said:

"The second ground of error assigned by appellant is the refusal of the court to allow in evidence—as proof tending to show the good character of the defendant—a certificate of the discharge of the defendant from the United States army for disability, which also certified his character to be good. It does not appear what particular traits of character were certified to in the document excluded; but we do not know of any rule which—upon the general issue of character—allows the introduction of written declarations, official or otherwise, made by third parties out of court. We think, therefore, that this point is not tenable."

Of course, if such a certificate was not competent evidence tending to show defendant's good character, it would not be competent evidence tending to show his bad character, if perchance statements therein should have that tendency.

Counsel for the state insist that the paper was admissible because of statements made in the endorsement upon the back thereof above quoted tending to show appellant to be physically and mentally sound, in view of his plea of mental irresponsibility. We think the paper was not competent proof upon that subject. The statement was wholly *ex parte,* not made under oath, nor with any opportunity on the part of appellant to cross-examine the person making it. This was not the meeting of his witnesses face to face, as guaranteed by § 22, art. 1 of our constitution. In *Johnson v. State,* 57 Fla. 18, 49 South. 40, discussing a claim of error, made in behalf of the accused, rested upon the admission in evidence of a certificate of discharge from the state hospital for the insane, the accused's defense being insanity or mental irresponsibility, the court said:

"To rebut the defendant's evidence as to his insanity at the time of the alleged homicide, the court admitted in evidence, over the objection of the defendant, a certificate of the superintendent and physician at the state hospital for the insane to the effect that the defendant was on July 25, 1908, 'discharged from the hospital by order of the examining board; he not being insane.' The issue being tried was the insanity of the defendant when the homicide was committed, and, even if the certificate had any bearing upon that issue, it was not legal evidence. The statute does not make the certificate evidence for such purpose, and it does not appear that the defendant had been given in a judicial proceeding an opportunity to cross-examine the persons making the certificate. See *Putnal v. State*, 56 Fla. 86, 47 South. Rep. 864. It cannot be said that the certificate did not influence the jury in determining whether a reasonable doubt had been raised as to the defendant's guilt, and that the defendant was not harmed."

In *Commonwealth v. Crowley*, 26 Pa. Sup'r Ct. 124, the accused, being charged with homicide, sought to justify the killing with which he was charged on the ground of self-defense. Disposing of the assigned error of the trial court in admitting in evidence a certificate of discharge from the army with endorsement thereon showing his physical characteristics, the appellate court said:

"On the trial of the case the defendant introduced evidence of the height and weight of his adversary for the purpose of showing disparity of physical strength. This was admittedly competent and was material under the facts disclosed. This evidence showed, among other things, that Ryan was about five feet nine inches high. In reply to the evidence for the defendant on this point, the commonwealth introduced a paper purporting to be a certificate of discharge of Ryan from the United States Army which contained a descriptive list stating the age, height, complexion, color of hair and occupation of the soldier. His height was given as five feet five and three fourths inches. We do not deem it necessary to determine the question whether the discharge offered in evidence is self-authenticating and *prima facie* admissible as evidence for any purpose. We do not consider it

competent for the purpose for which it was admitted. The paper is not a record nor does it appear to be a copy of a record. It is a document delivered to a discharged soldier, presumably to place in his possession evidence of his service and lawful discharge. It is for his use and protection only. The personal description therein contained is given for identification and is purely incidental to the object of the paper which relates to service and discharge."

Speaking further to the question of prejudice, the court said:

"It is contended, however, that the introduction of this evidence did not injure the defendant. That it was considered relevant by the commonwealth at the trial is evident. Testimony introduced by the defendant tended to show that Ryan was a man of much greater strength than the accused. This, if believed, might have an influence with the jury in at least creating a reasonable doubt as to the guilt of the defendant. It was important, therefore, for the commonwealth to produce rebutting evidence and it is manifest that a document purporting to be issued under the authority of the War Department giving an exact measurement of the height of Ryan would have great weight with the jury upon that point. It is not a logical answer to the objection to say that the defendant had introduced testimony upon this point and that he had the full benefit of it. He was entitled to all the weight of his own competent evidence without any diminution or impairment by inadmissible evidence in rebuttal. It is impossible to determine to what extent this evidence may have influenced the jury. And, as was said in *Zell v. Commonwealth*, 94 Pa. 258, 'because of that uncertainty it should not have been admitted.'"

We are of the opinion that the admission of this certificate in evidence was erroneous in any possible view of the case.

There was offered in rebuttal by counsel for the state, and admitted in evidence over the objection of counsel for appellant, a paper purporting to be a letter from appellant's wife to her mother, dated February 1, 1912, which, it will be noticed, was 27 days before her decease, and shortly prior to her leaving La Grande and going to Walla Walla. This

letter, in which she refers to appellant as Billy, reads as follows:

"La Grande, Ore., Feb. 1, 1912.
"Mrs. L. M. Chapman

"Dear Mother: I am writing to ask you for a ticket or enough money for which I can buy a ticket to Franklin. I want to come to you I cant live with Billy any longer he is disagreeable nothing I do pleases him and he pulls and batters me around so that I am on the verge of sickness So please send me the ticket, mother, as he swears that I shall not leave La Grande on any of his money he wont give me any and he raves and tears when I spend any for the least little thing. Mother please dont delay I will explain further when I see you from      Your Loving Daughter

"Alice

"1520 Monroe St. La Grande Ore.

"He has such a temper that Im almost afraid of him."

The letter addressed to appellant's wife from her mother and received by appellant at La Grande shortly after she went away, from which he learned that her mother had not sent money, was evidently written in reply to this letter. The admission of this letter in evidence counsel for appellant insists was erroneous, and worked to appellant's prejudice. Counsel for the state insists that this letter was admissible to rebut statements made by appellant in his testimony which tended to minimize the troubles between himself and wife while they were living together, and that it was admissible as one of a series of letters bearing upon their troubles. Counsel for the state apparently invoke the general rule that, where a letter has been introduced in evidence, a reply thereto rebutting an inference that would naturally be drawn therefrom is admissible; citing *Turner v. Phoenix Ins. Co.*, 55 Mich. 236, 21 N. W. 326, and other authorities. The trouble with counsel's contention is that no other letter was offered in evidence having any connection whatever with this letter purporting to be a reply to it, or purporting to be a letter to which it was a reply. It is true that appellant testified to having received and opened a letter from his wife's mother,

from the contents of which he learned that his wife had not received money from her mother; but the letter itself was not offered in evidence; appellant evidently not having it any longer in his possession. It seems clear to us that this fact did not entitle the state to put in evidence this letter for the purpose of showing the wife's version of their domestic troubles. Her statements along that line contained in this letter were purely *ex parte* and not in the least binding upon appellant. Nor did they throw any light upon, or rebut the inferences to be drawn from, facts contained in the letter from the mother which appellant opened and from which he learned his wife had not received money from her mother, in so far as facts stated in that letter are brought to our knowledge by appellant's testimony. We are unable to see how, in any aspect of the case, *ex parte* statements made in this letter by the wife, purporting to give her version of their domestic troubles, could be admissible in evidence against appellant.

Some contention is made that the objections, interposed by counsel for appellant upon the trial to the introduction of the discharge paper and this letter of his wife to her mother were too general to entitle appellant at this time to have their admission in evidence noticed by us, even though they were inadmissible. It must be conceded that counsel's objections to the introduction of these papers were somewhat general, being, in substance, that they were "incompetent," and "not proper evidence." We do not lose sight of nor ignore the general rule that objections to inadmissible evidence must be made in such manner as to reasonably apprise the court of the ground of inadmissibility claimed. We are not, however, in a capital case, disposed to measure with any great degree of nicety the form of an objection to inadmissible evidence where prejudicial effect is clearly apparent, and where the evidence objected to is clearly inadmissible under any possible aspect of the case. The rule invoked by counsel for the state has its limitations under such circumstances. In 1 Thompson on Trials (2d ed.), at § 697, it is said:

"In a case already much quoted from, in the opinion given by Dunne, C. J., the following judicious observations occur: 'There are numerous authorities and adjudications in support of the natural, common-sense proposition that a general objection raises no issue, except it is as to whether the evidence would, under any circumstances or for any purpose, be admitted; and that a specific objection raises no other issue than the particular one tendered. They are also in support of the proposition that if a judge overrule a general objection, he must be sustained unless it clearly appears that, under no possible circumstances in the case would the evidence come in; that if he sustain a general objection, he must be reversed if it is possible that, under any view of the case, the evidence might be admitted."

Expressing the same view, the supreme court of Florida, in *Putnal v. State*, 56 Fla. 86, 47 South. 864, said:

"It is settled law here that general objections to evidence proposed, without stating the precise grounds of objections, are vague and nugatory, and are without weight before an appellate court, unless the evidence objected to is palpably prejudicial, improper and inadmissible for any purpose or under any circumstances."

In *Nightingale v. Scannell*, 18 Cal. 315, 323, the limitations upon the rule invoked by counsel for the state is even more clearly shown by observation of Justice Cope, speaking for the court, as follows:

"On the trial of the case, the plaintiff, in proving the damages, was allowed by the court to give in evidence the retail value of the goods; the defendants objecting in general terms to the introduction of this evidence. The action of the court in that respect is assigned as error; but the plaintiff claims that if an error was committed, the defendants are not in a situation to take advantage of it. He contends that a general objection is not sufficient to support the assignment, and that in all cases a specification of the grounds of an objection is necessary to render it effectual. The defendants claim that the evidence was not admissible for any purpose, and that a statement of the grounds upon which it was objected to would have been superfluous, and was not therefore required. This view is based upon what appears to us to be the proper

rule in such cases, and we see no good result to be accomplished by holding parties to a more strict and rigid practice in these matters. The Practice Act provides that where an objection is made and an exception taken, the point of the exception shall be stated; but it does not follow that a general objection to the admission of incompetent evidence is not sufficient. On the contrary, the incompetency of the evidence sufficiently indicates the ground of the objection, and the point of the exception is as clearly perceptible as if it were expressed in words. We do not understand the provision referred to as requiring anything more than that the point of the exception shall be so stated as to be apparent to the court; and whether it be stated in express terms or appear by necessary implication from the nature and subject-matter of the objection is immaterial. There is no doubt that a general objection to the introduction of evidence will not be available unless the evidence objected to is absolutely incompetent; but where that is the case, we do not see upon what principle such an objection could be held to be insufficient. Nothing more is required to put the adverse party upon notice that the competency of the evidence is called in question; and if an error intervene on account of its admission, we think the generality of the objection should not be received as an answer. . . . In *Merritt v. Seaman*, 2 Selden, 168, the rule adopted by us in this case was laid down and acted upon by the Court of Appeals of New York. A general objection had been taken to the introduction of evidence, and it was held that, as the difficulty could not be obviated, such an objection was all that was necessary. The same point precisely is presented in this case, and we think there is nothing in reason or propriety calling for a different determination."

See, also, *People v. Gordon*, 99 Cal. 227, 33 Pac. 901.

In Hayne, New Trial and Appeal (Rev. ed.), p. 517, after reviewing the authorities, it is said:

"The rule, then, may be stated to be that objection to the admissibility of evidence must be specific in all cases where the objection could be obviated if pointed out, but that where it could not be obviated a general objection is sufficient."

See, also, 8 Ency. Plead. & Prac., 228. We are of the opinion, in view of the fact that both the discharge and the letter above

quoted were not admissible under any aspect of the case, that their introduction in evidence was sufficiently challenged to entitle appellant to have the question of their admissibility reviewed here. That this is a capital case, the more strongly impels us not to deny appellant a review of these claimed errors.

We have probably already made sufficient observations as to leave little to be said upon the possible prejudicial effect upon appellant's rights from the admission in evidence of this discharge and letter. We have noticed that appellant was convicted of murder in the first degree. The jury so finding, necessarily means that they found the homicide to have been committed with premeditation. It seems to us that the evidence of premeditation is not very convincing, though we are free to say that we would not feel warranted in setting aside such conviction upon the ground of insufficiency of evidence to show premeditation. It seems to us however not at all improbable that, in the absence of this inadmissible evidence reflecting upon appellant's character and pointing to ill treatment by him of his wife, the jury might have found him guilty of murder in the second degree only. We have with great care read every word of this entire record and cannot escape the conclusion that appellant has not had a fair trial.

In view of the fact that, because of the errors we have noticed, appellant must be awarded a new trial, we deem it proper to make some observations relative to instructions given to the jury touching appellant's defense of mental irresponsibility. These observations we desire to have regarded as words of caution, rather than as a critical examination or finding of positive error in the giving of such instructions. The latter is unnecessary in view of the awarding of a new trial on the grounds already noticed. The learned trial court occupied many typewritten pages in defining appellant's rights in the making of that defense. Reading them as a

whole, they seem to us to be unduly lengthy and somewhat confusing on that subject, especially to the lay mind. One of them, to which we desire to call particular attention, reads as follows:

"But, since it is subject to great abuse and may be, and often is, resorted to where the proof of the overt act is so strong as to afford no other feasible means of escape from impending conviction and punishment, the evidence to sustain it should always be carefully scrutinized to see that the facts disclosed by it fully measure up to the requirements of the law, and that an ingenious counterfeit of mental irresponsibility is not used to deceive the jury and to thus induce them to acquit a guilty man and defeat the ends of justice."

This, together with some other remarks made upon the subject of this defense, it seems to us, breathes too much a spirit of fear that the jury may give too much credence to this particular appellant's defense of mental irresponsibility. It certainly comes very near suggesting the court's view of the facts touching this defense made by appellant, and being a comment thereon, in violation of § 16, art. 4 of our constitution, providing that: "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." We deem it proper that we should at least comment upon the instruction given, to this extent.

The judgment is reversed and appellant granted a new trial.

CROW, C. J., and GOSE, J., concur.

CHADWICK, J. (concurring)—I concur; furthermore, I think the instructions given by the court on the defense of insanity were, when taken as a whole, entirely wrong. The governing rule in such cases was settled in this state in the case of *State v. Craig*, 52 Wash. 66, 100 Pac. 167. The authority of this case has never been questioned or denied, though referred to in several cases. There is no reason why instruc-

tions covering this issue should not be simple and direct. It is a defense allowed by law, and in no event should it be discredited by the court.

Mount, J., dissents.