[No. 28998.   *En Banc.*   August 28, 1943.]

The State of Washington, *Respondent*, v. Harry Severns, *Appellant*.[1]

*Z. O. Brooks,* for appellant.

*Edgar H. Canfield,* for respondent.

Mallery, J.—The defendant, Harry Severns, was convicted of forcible rape in Klickitat county in September, 1941. He appealed to this court and was granted a new trial. He was again convicted in December, 1942, on an amended information. This is an appeal from the latter conviction. The facts in this case are substantially the same as those set out in the opinion of this court in the first

[1] Reported in 141 P. (2d) 142.

appeal as recorded in *State v. Severns,* 13 Wn. (2d) 542, 125 P. (2d) 659. It would serve no useful purpose to repeat them here.

The appellant makes eight assignments of error. His assignments numbered 2, 7, and 8 involve questions which were discussed in the above-cited opinion, and, being substantially the same here, will be controlled by it. The previous rulings were adverse to appellant's present contentions.

■ Appellant's first assignment of error will not be considered, because the instructions to the jury complained of are not set out in full in his opening brief. Rule XVI, subd. 5, of the Rules of the Supreme Court, 193 Wash. 25-a; *State v. Hussey,* 188 Wash. 454, 62 P. (2d) 1350; *Smith v. Eldridge Motors, Inc.,* 199 Wash. 10, 90 P. (2d) 257, 93 P. (2d) 1120; *Walker v. Copeland,* 193 Wash. 1, 74 P. (2d) 469; *State v. Severns,* 13 Wn. (2d) 542, 125 P. (2d) 659; *Moffitt v. Goldcamp,* 195 Wash. 75, 79 P. (2d) 695; *State v. Jensen,* 194 Wash. 515, 78 P. (2d) 600.

Appellant's second assignment of error is without merit. The evidence is ample to sustain the verdict.

Appellant's assignments of error numbered 3, 4, and 5 relate to testimony about exhibits numbered 9 (a sheet) and 10 (panties) and their admission in evidence.

■ Exhibit numbered 9 was a bed sheet which had had several pieces cut out of it after it had come into the possession of the county sheriff. An appropriate objection was made by the appellant at the time of its admission, which was error. However, a careful scrutiny of the entire record reveals that it was not prejudicial error because the appellant, prior to the time it was offered in evidence, had, in cross-examination of the county sheriff, developed the full details in regard to it.

Furthermore, while this cross-examination went in without objection by the state, it was not apropos of anything in the direct examination of the witness. Since the appellant chose to develop the subject and elicited oral testimony on the very facts he now claims would be wrongfully

inferred from the admission of the exhibit, we think the injury was self-invited. But for this, the admission of exhibit 9 would have constituted prejudicial error.

■ When exhibit 10 was offered in evidence, the appellant objected, but failed to give any reason or ground for the objection. It is well settled that an objection must apprise the court of the ground upon which it is made, otherwise no error can be predicated upon it. *White v. Fenner,* 16 Wn. (2d) 226, 133 P. (2d) 270.

■ Appellant's seventh assignment of error concerns the following testimony of Sheriff House:

"Q. What attempt did you make to determine who this hair came from? By Counsel for Defendant: We object. I think it is very patent here, but when it comes to the point of insinuations of the kind, he testified he did not know what it was, but what he took it to be, and they are going off on a side road as to some other attempt. I think it is entirely out of line. He was a peace officer at the time and he can testify what he found. He said at the outset it was something he took to be—By the Court: He may tell us what he did towards ascertaining its source. By Counsel for Defendant: May I have the record show an exception? By the Court: Yes. Q. What did you do? A. I asked Mr. Severns for a sample of hair off of the lower part of his body to send it to Washington, D. C., for comparison. Q. What did he do? A. He refused."

We cannot hold that the question propounded to the witness revealed what the answer would be or that it would be inadmissible. The particular answer turned out to be, in fact, inadmissible because the appellant was not obliged to produce evidence against himself. It was therefore improper to show that he had refused to do so. However, this all appeared after the answer, and not before. A motion to strike the evidence should have been made. Appellant did not see fit to make it, and cannot now object because it was not stricken.

The judgment is affirmed.

BLAKE, J., concurs.

MILLARD, J., dissents.

JEFFERS and BEALS, JJ., concur in the result.

STEINERT, J. (concurring in the result)—I concur in the conclusions reached in the majority opinion except in so far as what is therein stated with reference to exhibit 9 (bed sheet). In my opinion, appellant's assignments of error with respect to the admission of the exhibit should be disposed of not upon the ground that such admission, while erroneous, was not "prejudicial," but, rather, upon the ground that no error at all was committed in that respect.

Although certain pieces had been cut from the sheet, the remainder thereof contained evidence of "splotches" which the jury had the right to consider in connection with the other evidence in the case. Whether or not the missing portions of the sheet likewise contained such splotches or other traces of defilement does not appear from the record, and there is absolutely nothing in the state's evidence from which it could be said that the jury was permitted to speculate or conjecture as to the condition of the missing portions. Whatever suggestion or inference may have arisen in that respect was created by the cross-examination adduced by appellant's own counsel. If any prejudice to his defense resulted from such cross-examination, he cannot now complain. In any event, it could not render the exhibit inadmissible in its entirety.

SIMPSON, C. J. (dissenting)—I feel compelled to write this dissent for two reasons:

First, because I cannot agree with the result obtained by the majority; and, second, I feel that the judges and practicing lawyers of this state are entitled to know the factual background upon which the opinion is rested.

The facts in this case, so far as exhibits Nos. 9 and 10 are concerned, cannot be substantially the same as in the former case for the reason that the exhibits were never offered or admitted in evidence at that trial.

At the time of the commission of the alleged crime, Mr. C. R. House was sheriff of Klickitat county and visited the home of the prosecuting witness and made an examination

of her bedroom and its furnishings on the evening of the day following the alleged attack. He made an examination of the bed, and noticed thereon some dirt, some human hairs, and shoe prints. One day later he took from the room the bed sheet and a pair of panties which were identified as belonging to Miss Marlow, now Mrs. Howard. The two articles just mentioned were later admitted in evidence as exhibits 9 (the sheet) and 10 (the panties). The sheet has six irregular holes cut in various portions. Also there are a few stains and several red pencil marks and other splotches of color resembling blue and red pencil coloring. Who made these markings or cut the holes is, so far as the record discloses, unknown. It is clear, however, that the changes I have indicated were made after the sheet was taken from the bed and before it was offered in evidence. In speaking of the condition of the sheet when offered in evidence, Mr. House testified:

"This sheet is in, as nearly as I can see here, practically the same condition as when I took it off of the bed with the exception that these holes were cut in the sheet to take samples out of it, I presume where the spots were on the sheet. I did not cut these out, so I cannot say what they were cut there for, only that the spots were missing, certain spots. The way that I have of identifying the sheets as being the same sheet is that I marked it for identification when I took the sheet from the house."

At the time the sheet was offered in evidence, the attorney for defendant objected to its introduction, using the following words:

"I object to this under the conditions of the testimony now before the court this morning that this was in the possession of Sheriff House all the time until he turned it over to the prosecuting attorney, and now it develops it has been in the mails and has been sent to some place else, the F. B. I., and has been mutilated and pieces taken out of it, and it is here now under these circumstances without being able at all times to identify where it has been and that it is not in the same condition. It is a very dangerous thing for any purpose to have evidence brought in two years and two months afterwards, and after being in the hands of people who are not here, and no proof before the court, or

suggestion even before the court that it is in the same condition, nor, in fact, the same condition, and the evidence shows chunks have been cut out. If this be admitted now under these circumstances there is no protection to us under the rule."

The first question then presented is whether the sheet was admissible in evidence. I agree that if it had been in its original condition it would have been admissible. It would have illustrated the manner of attack as testified to by Miss Marlow and explained and thrown light on the criminal transaction. It was the evident purpose of the state in introducing the exhibit to show that semen had stained the sheet, thereby showing that a sexual act had occurred.

"In order that a physical object connected with the commission of the offense be admitted into evidence, it is necessary to show that such object is in practically the same condition, without substantial change, as at the time the offense was committed." Vol. 2, Wharton's Criminal Evidence (11th ed.), § 757, page 1281.

It is my contention that the bed sheet had been materially altered after it had been found at the Marlow home and before it was admitted in evidence.

Another reason for holding the sheet to be inadmissible in its changed condition is that during the two-year period it was in the hands of several individuals who were not called to testify. Part of the time it was in an unlocked steel vault in the clerk's office which was open in the daytime to anyone. Part of the time it was in the United States mails when it was sent to the Federal Bureau of Investigation. Many changes could have been made during the two-year period the exhibit was in the hands of several individuals. Taking into consideration this fact and the further fact that the exhibit was mutilated and that there were various stains upon it not testified to by anyone and the further fact that the cloth cut from the exhibit was not produced, it should be held that the exhibit was inadmissible and that its admission in evidence was prejudicial to the rights of the defendant. *State v. Ilgenfritz,* 263 Mo.

.615, 173 S. W. 1041. Appellant had no opportunity to cross-examine many of the individuals into whose hands the sheet had fallen, nor did he have an opportunity to inquire of those who cut the holes in the sheet. Furthermore, he had no opportunity to examine the portions of the sheet that were cut out.

While admitting that the exhibit was inadmissible, the majority holds that the defendant waived any objection by cross-examining the witness House prior to the time the sheet was offered in evidence.

Relative to the examination of the bed in the Marlow house on the evening of the day following the attack, Mr. House testified on direct examination:

"Q. I will ask you whether or not you examined the bed or beds in the bed room in this house at the time you made this investigation? A. Yes, I did. Q. What if anything did you find on the bed? A. Well, there was marks on the bed that showed shoe prints. By COUNSEL FOR DEFENDANT: It is not for this man to interpret. He can tell what he saw, and it is for the jury to interpret. By THE COURT: He may tell us what he saw. A. *There was dirt on the bed,* and there was *one shoe mark on the bed.* Q. Did you *find anything else on the bed or in the bed or on the bed clothes?* A. Yes, sir. Q. *What?* A. *I could not tell you what it was.* There was human hair, or hair that I took to be human hair, to the best of my knowledge. Q. Did you save that at the time? A. We did." (Italics mine.)

The following occurred on cross-examination:

"Q. Did you testify in the last trial that your testimony given in connection therewith, there was foot tracks, or a heel track, or whatever it was there in the bed? A. I do not believe the question was asked of me. Q. What was it you said about foot prints, or heel, or what? A. That showed on the sheet? Q. Yes. A. It was a shoe print. Q. You do not believe that question was asked at the former trial? A. I do not think it was. Q. Where are the sheets? A. I do not know. Q. Did you save them? A. They were put in, and kept in there. I do not know. Q. They were? A. They were still in 1940. Q. Who kept them? A. They were kept in my office until the first trial. Q. Were they introduced at the last trial? A. I do not remember. Q. Don't you know they weren't? A. I do not know that they

weren't. By Counsel for Plaintiff: This sheriff did not try that other case. By the Court: Not unless it was within his personal knowledge. By Counsel for Defendant: He said he had them and they were in his personal possession. I will ask— Q. What happened to them? A. They were in my possession up until the trial started, and they were turned over to the prosecuting attorney. Q. Turned over to the prosecuting attorney? A. Yes. I do not know where they are at now, or what has become of them. Q. *Was there anything else on those sheets that you observed besides pieces of hair?* A. Yes, *there was smears on them.* Q. What do you *mean by smears?* A. Mr. Brooks, *you are a married man. I cannot tell you what the smears were, but there were smears.* Q. Whatever there was on there, I do not want to have this jury *left to speculate as to what the smear was. Was there blood on them?* A. No. The question was—I am not a doctor, all I can tell you is what I took them to be, what my thoughts were. Q. You can describe them more definitely. Did they look like — A. I will describe to you what they looked like. Q. *Was it vomit in your opinion?* A. *No. It looked more like some man had been in bed and discharged* in the sheet. Q. So that is what the thoughts were, in your position? A. It was. Q. That was on the sheets that were turned over to the prosecuting attorney? A. It was." (Italics mine.)

This is the cross-examination labeled by the majority as developing the full details in regard to the exhibit. Miss Marlow earlier in the case had testified that in her excitement she had "vomited" on the "bed clothes."

Did the cross-examination set out above waive appellant's rightful objection to the introduction of the sheet?

It has been held in a great number of cases that cross-examination should be restricted to the scope of matters brought out on direct. However, this court has not held to a strict enforcement of that rule.

The right of a person accused of crime to cross-examine opposing witnesses is implied in the constitutional provision that he shall have the right to meet the witnesses against him face to face.

"It is true that this court has adopted the so-called American rule relative to the cross-examination of witnesses, but we have not so narrowed it as to hold that the

cross-examination must be confined to the questions asked on the direct examination. On the contrary, we have said that when, in the direct examination, 'a general subject is unfolded, the cross-examination may develop and explore the various phases of that subject.' *Bishop v. Averill,* 17 Wash. 209, 49 Pac. 237, 50 Pac. 1024. In *Coey v. Darknell,* 25 Wash. 518, 65 Pac. 760, we held, in an action upon a promissory note, where there was an issue as to whether the note had been partially paid by the delivery of a crop of wheat, that a witness testifying to the delivery might be questioned on cross-examination as to the condition of the crop, notwithstanding the witness had not been questioned on the subject in his direct examination. In *Grant v. Spokane Traction Co.,* 47 Wash. 112, 91 Pac. 553, where the action was for personal injuries, we used this language:

" 'When the plaintiff B. M. Grant was a witness, it developed upon his direct examination that he was commonly called "doctor." He also testified that, when his wife was injured, the conductor of the car asked him his name and, in reply thereto the witness handed the conductor a small handbill containing his name, picture, location of his office, and an advertisement of his methods of treatment. On cross-examination counsel for defendant was permitted to ask the witness if he was a licensed practitioner, and if he had prescribed for his wife; and counsel for defendant was also permitted to introduce the handbill above mentioned in evidence, and question the witness concerning the same. We see no impropriety in this cross-examination. The jury was entitled to know who the witness was and the character of his business. Plaintiff contends that the object of the examination was to prejudice the witness before the jury; but we find nothing either in the examination or in the substance of the evidence in the record to justify a reversal upon this ground alone. There was certainly no abuse of discretion on the part of the trial court in respect to the cross-examination of this witness.' " *Wilson v. Miller Flour Mills,* 144 Wash. 60, 256 Pac. 777.

Our theory of permitting a broad scope of cross-examination is in reality based on the belief that, of all the tests which the law has provided for the ascertainment of truth, the right of cross-examination is justly deemed the most powerful and efficacious.

The rule relative to the right to cross-examine is well

stated in Thompson on Trials (2d ed.), vol. 1, page 420, § 406:

" 'The benefit of cross-examination is an essential condition to the reception of direct testimony;' that is to say, testimony is not admissible, if the party against whom it is to be used, or those in privity with him, have no opportunity of cross-examining the witness. The right of cross-examination being a substantial and a very important right, it is *error to restrict it,* so far as to prevent the cross-examining party from going fully into all matters connected with the examination in chief. 'The importance of the right of full cross-examination,' says Scott, J., 'can scarcely be overestimated. As a test of the accuracy, truthfulness and credibility of testimony, it is invaluable. It is the clear right of the cross-examining party to elicit suppressed facts, which weaken or qualify the case of the party examining in chief, or support the case of the cross-examining party. In any view, the right of cross-examination extends to all matters connected with the *res gestae.* A witness may be cross-examined as to his examination in chief in all its bearings, and as to whatever goes to explain or modify what he has stated in his examination in chief,' and *prejudice* will be *presumed* where this right is denied."

I have italicized the portions of the direct and cross-examination which related to the condition of the bed sheet. In view of the testimony of Miss Marlow that she had "vomited" on the bed and the statement of Mr. House that *"there was dirt on the bed," "one shoe mark on the bed,"* and *human hair* or something the witness took to be human hair and something else that he could not identify, it is clear that appellant's attorney was well within his right in asking the witness concerning the *shoe print,* the unidentified impressions, the human hair, and whether there was blood or vomit on the sheet. In fact, in cross-examining this witness, counsel could have gone much further. At that time he had every reason to believe that the state would offer the sheet in evidence. It was his right to test the memory and credibility of the witness and to establish facts upon which to base an objection to the admission of the sheet in evidence. To hold that a defendant who has a right to cross-examine by that cross-examination

waives his right to object to the offer of an important article in evidence, is to, in fact, deny the right of cross-examination, and makes entirely useless the right accorded him in the first instance.

The judgment should be reversed.

ROBINSON and GRADY, JJ., concur with SIMPSON, C. J.