[No. 31089. Department One. March 27, 1950.]

THE STATE OF WASHINGTON, *Respondent,* v. CLAUDE SPEER, *Appellant.*[1]

[1] Reported in 216 P. (2d) 203.

*John W. Brisky,* for appellant.

*Reuben C. Youngquist, Charles F. Stafford, Jr.,* and *George E. McIntosh,* for respondent.

DONWORTH, J.—The defendant was charged by information with the crime of abduction, based on Rem. Rev. Stat., § 2439 (1) [P.P.C. § 118-189], as follows:

"He, the said CLAUDE SPEER, in the County of Skagit, State of Washington, on or about the 30th day of March 1949, without the consent of the father or mother, guardian or other person having legal charge of Margaret . . . willfully, unlawfully and feloniously did take the said Margaret . . ., then and there a female person under the age of eighteen, to-wit: of the age of fourteen years, for the purpose of marriage, contrary to the form of the statute in such cases made and provided, and against the peace and dignity

of the State of Washington." (The full name of girl alleged to have been abducted is omitted. She will be referred to herein as Margaret.)

Appellant entered a plea of not guilty, and the case came on for trial before the court sitting with a jury.

After the state's attorney had made his opening statement and the first witness for the state had begun to testify, the defendant, in the absence of the jury, interposed a demurrer to the information on the ground that it failed to specify the person having legal charge of the girl alleged to have been abducted.

The demurrer was overruled, whereupon the trial proceeded and resulted in a verdict and judgment of guilty. The trial court sentenced the defendant to imprisonment in the state penitentiary for a period of not more than ten years. From this judgment and sentence he has appealed to this court.

The facts essential to an understanding of the legal questions presented by this case are essentially undisputed. Appellant resided in Anacortes at the time of the commission of the alleged offense and had been a resident of that city for thirty years. For approximately ten years prior to September, 1948, he had employed Margaret's mother as his housekeeper. During that time, appellant and his housekeeper lived together as man and wife, and appellant had supported Margaret as though he were her father. In the summer of 1948, Margaret's mother left the employ of appellant (taking Margaret with her) and married her present husband. She is designated in the record as Mrs. Wright.

Immediately upon commencing to live in the home of her stepfather, Margaret was mistreated by her stepbrother to such an extent that she was on the verge of a nervous breakdown and finally complained about her mistreatment to appellant, who took the matter up with Mr. Robert Crompton, probation officer of Skagit county. Pending a hearing in the juvenile court, Mr. Crompton, in accordance with Rem. Rev. Stat., § 1987-12 [P.P.C. § 359-23] (as amended in 1945),

released Margaret into the custody of Mrs. Eva Fraser, the mother of appellant, pursuant to a mimeographed instrument entitled "Agreement to Produce Said Minor in Juvenile Court."

This agreement was executed by Margaret and by appellant on behalf of his mother. It recited that, in consideration of the release of Margaret into the custody of Mrs. Fraser, "who will act as guardian of the child,"

". . . we hereby agree:

"(1) THAT the above mentioned minor will be produced in the Skagit County Juvenile Court on the date to be set and at the time and place to be set for such hearing in this Cause, by the Court.

"(2) THAT it is hereby agreed the said minor, while in our custody, will be under strict discipline and on her good behavior until the Court shall have disposed of this Cause for which said Minor child has been detained at the County Courthouse."

On the same day that the "Agreement to Produce" was executed, Mr. Crompton wrote a letter to Mrs. Fraser authorizing her to call at the Wright home for the purpose of securing Margaret's clothing and school supplies.

The case was heard in the juvenile court of Skagit county on September 23, 1948, at which time appellant and his mother, Mrs. Fraser, were present. Also present at this hearing were Margaret, her mother, her stepfather, the probation officer, a representative of the county welfare department, and a deputy prosecuting attorney. The juvenile court, after hearing the evidence, in a verbal order found that Margaret should be declared a dependent child, that the Wright home was an unfit place for her, and that the mother and stepfather were incapable of providing proper maintenance, training, and education for the child.

The juvenile court thereupon orally ordered: (1) that Margaret be declared a dependent child and made a ward of the court; (2) that the child be permanently removed from all custody and control of her mother and stepfather; (3) that Margaret be remanded to the temporary custody of Mrs. Fraser at least until the close of the 1949 school year;

(4) that appellant, having expressed his willingness to do so, support Margaret in the home of his mother, Mrs. Fraser; and (5) that jurisdiction over the welfare of Margaret be reserved by the court and that the court reserve the right to make any further or additional orders which might be required.

On October 27, 1948, appellant called upon Mr. Crompton to obtain some sort of written authority to hold the girl in Mrs. Fraser's home in case Mrs. Wright should voice any objection. Mr. Crompton thereupon wrote a letter to Mrs. Fraser informing her that an order had been signed by the court placing the care and custody of the child with her. Actually the verbal order of September 23, 1948, had not yet been reduced to writing and signed by the court. This was done December 1, 1948. No copy of this order was ever given to Mrs. Fraser.

Early in March, 1949, appellant discovered that Margaret had become pregnant as a result of sexual relations with a married man who lived near Mrs. Fraser's home. Mrs. Fraser, Margaret, and appellant discussed this situation on a number of occasions, and it was finally decided that, in the best interests of every one concerned, appellant should marry Margaret. At that time, Margaret was but fourteen years and ten months old and still a ward of the court by virtue of the order of December 1, 1948. Appellant was forty-one years of age. However, appellant's mother, who claimed to be Margaret's guardian, consented to the proposed marriage. According to appellant's testimony, his mother was too ill to accompany Margaret and him when they applied for a marriage license.

On March 26, 1949, appellant and Margaret went from Anacortes to Everett, where they executed an application for a marriage license. In this application, appellant swore that he was thirty-one years old and that his address for the past six months was "Gen. Del. Pasco, Wash." Margaret swore that she was eighteen years old and that her address for the past six months was "Route No. 1, Pasco, Wash."

After applying for this license, they returned to Anacortes. The license was received by appellant from the county auditor of Snohomish county on March 30th. He and Margaret then went to see her aunt at Clear Lake to discuss the proposed marriage. On the same day, appellant telephoned long distance to Mr. Crompton, the probation officer at Mount Vernon, to ask him what he thought about the proposed marriage. On cross-examination, his testimony about the telephone call was:

"Q: That is right. So now you want this jury to believe that the only one you thought had to give permission to take this girl, for permission for marriage, was your mother? A. That's right. Q. And in spite of that you called Mr. Crompton to verify it or, as I understand it, 'to get his backing'? A. To get his backing if *her* mother put up any fuss. Q. Did Mr. Crompton tell you at that time, at the time of the telephone call that if you would marry this girl he would probably get the authorities to pick you up? A. No, he did not. Q. Did he tell you to get her right back and get her in school? A. He said I should come back to Skagit County. Q. Did he tell you to marry? A. He didn't tell me to marry; I didn't ask him to. Q. Did he tell you emphatically not to marry her? A. I don't remember whether he said not to in that instance. Q. Was this conversation friendly or authoritative on his part? A. Well, it started out friendly and finally he said he was mad. Q. How did it end? A. It ended up 'I am mad. I won't discuss it with you.' Q. Didn't he say to bring that girl back? A. He said to bring her back to Skagit County. Q. And if you didn't bring her back he would advise the authorities? A. No. Q. And after you finished talking to him you knew you didn't have his permission. A. I didn't ask for permission. Q. Did you know you didn't have his backing? A. I knew he wouldn't back us up if *her* mother put up a fuss. Q. You knew very well at that time you didn't have permission from the authorities. A. Yes. Q. Did you ever ask Judge Brickey for permission to marry this girl? A. No, I did not." (Italics ours.)

Mr. Crompton's version of this conversation differs from that of appellant in some respects. He testified on direct examination:

"A. On Wednesday afternoon, the 30th of March, 1949, there was a call, apparently from a pay station in

Seattle because I distinctly heard the girl say 'Deposit 60 cents for three minutes' conversation,' and the conversation opened by saying, 'Is that Mr. Compton?' and I said, 'yes.' And he said, 'This is Claude Speer. I have just arrived in Seattle with Margaret and we want to get your and the Court's permission to get married.' Q. What was your answer to that, Mr. Crompton? A. I then told Mr. Speer—first of all, I asked him how old he was and how old she was. I wanted to refresh my memory as to the record because I suspected she was only 14 and was still in the compulsory school age, compulsory school age attendance bracket and should be in school. So, my reply to Mr. Speer was very definitely and very emphatically that no permission to marry could be given and that he should get that girl back to Anacortes just as quickly as he possibly could; back to school and back into the temporary foster home where she should be; and she should not be doing that and he might be endangering himself because it might be necessary for me to file an information against him if he abused that girl in any way. Q. So far as you know, did the Court give the defendant any permission to marry this girl and to take her from Anacortes for the purpose of marriage? A. Not to my knowledge."

On the following day (March 31st), appellant and Margaret were married in Seattle and spent the next ten days in a cabin on Whidby Island, although appellant testified that he was frequently in Anacortes during this period. After Margaret had been absent from school for two weeks or more, the probation officer called the prosecuting attorney's attention to the possibility of her having been abducted by appellant, and later this information was filed.

█ The first assignment of error is based upon the court's refusal to sustain appellant's demurrer to the sufficiency of the information interposed after the state's first witness began to testify at the commencement of the trial. Appellant's counsel argued that the information was defective because it did not specify the person having legal charge of Margaret. It is not necessary to pass upon this assignment of error because this court has long held that such a challenge as was made in this case is neither timely nor a sufficient basis for setting aside a verdict of guilty. The general

rule is set out in *State v. McBride,* 72 Wash. 390, 130 Pac. 486:

"We have repeatedly held that a demurrer to the information, or any motion in the nature of a demurrer, may not be entertained pending a plea of not guilty, save the motion in arrest of judgment."

See, also, *State v. Beebe,* 185 Wash. 655, 56 P. (2d) 682. It may also be stated that appellant at no time ever moved for a bill of particulars with respect to the information nor interposed any motion in arrest of judgment. Since appellant's demurrer was interposed too late, no error can be predicated upon the trial court's action in overruling it.

■ Appellant's assignments of error two and three deal with the admission by the trial court of certain evidence. It is contended that the court was in error in permitting appellant to be cross-examined as to his previous relations with Margaret's mother. There are two answers to this argument:

(a) A copy of the juvenile court's order of December 1, 1948, had already been admitted in evidence without objection. The first finding contained in this order was: "Since the minor was four years of age, the mother of said minor has lived [in] lewdness as man and wife with one Claude Speer." Consequently, this relationship was before the jury at the time of the cross-examination of which appellant now complains; (b) appellant did not at the time state any specific ground for his objection to this cross-examination of appellant, and this court will not consider such an objection when definitely made for the first time on appeal. *Walker v. Sieg,* 23 Wn. (2d) 552, 161 P. (2d) 542.

■ The trial court admitted in evidence the application for a marriage license signed by appellant and by Margaret and subsequently allowed the state to cross-examine appellant in connection therewith, when the certificate of marriage had already been admitted in evidence. It is contended that, since there was no denial of the marriage, the only possible purpose to be served was to prejudice the jury by placing before them the possibility that the appellant might

have committed some other crime, namely, perjury. Since the offense defined by the abduction statute is the *taking* of a girl under the age of eighteen years for the purpose of marriage and not the marriage itself, we feel that it was proper for the court to admit the marriage application in evidence as bearing upon appellant's purpose at the time of the taking.

 Permitting cross-examination of appellant regarding the license application was proper, even though it tended to show that appellant might have committed perjury. The filing of the license application was a material step in the commission of the abduction. Furthermore, the only objection made to this cross-examination was that "it doesn't make any difference" whether appellant falsely stated his age on the license application. It is well settled that an objection must apprise the trial court of the specific ground upon which it is made. Otherwise, no error can be predicated upon it in this court unless the particular testimony could not be admissible under any conceivable theory. *State v. Shaw,* 75 Wash. 326, 135 Pac. 20; *State v. Severns,* 19 Wn. (2d) 18, 141 P. (2d) 142.

In assignments of error four to nine, inclusive, appellant complains of one instruction given by the court (to which appellant excepted) and the refusal of the court to give four instructions proposed by appellant. The sole issue is whether or not the instruction given was in accord with applicable provisions of the abduction statute (Rem. Rev. Stat., § 2439) and the juvenile court law (Rem. Rev. Stat., § 1987-1 [P.P.C. § 359-1]), and whether the requested instructions are in harmony therewith.

The instruction given by the trial court upon which appellant predicates his claim of error reads:

"When the Juvenile Court has permanently taken a child from the custody of its parents and has made such child a ward of the Juvenile Court, that Court then becomes the one having the legal charge of such child's person."

 Appellant vigorously argues that, before a conviction for violation of the abduction statute can be sustained under

the facts of this case, it must be proven that the minor child was taken without the consent of the "person" having legal charge of such child, and that the juvenile court is not a "person" within the meaning of the statute. Therefore, the juvenile court cannot be held to be "the one having legal charge of" Margaret. Since the juvenile court placed Margaret with Mrs. Fraser (appellant's mother), it is argued that it was she, and not the court, who had authority to consent to the girl's marriage.

Appellant quotes several dictionary definitions of the word "person" to prove his contention that the term cannot be construed to mean the juvenile court.

Though as a general rule "person" includes only a living being, nevertheless the two statutes above referred to must be construed, if possible, in harmony with each other in order to carry out the intention of the legislature. Section 2439, making abduction a crime, was enacted in 1909, and the present juvenile court law was enacted in 1913 and amended, in part, in 1945.

The first section of the juvenile court law (Rem. Rev. Stat., § 1987-1), after defining "dependent child" and "delinquent child," provides:

"For the purpose of this act only, all delinquent and dependent children within the state shall be considered wards of this state and their persons shall be subject to the custody, care, guardianship and control of the court as hereinafter provided."

By Rem. Rev. Stat., § 1987-14 [P.P.C. § 359-27], the courts are enjoined by the legislature to give the act a liberal construction, the first sentence thereof reading as follows:

"This act shall be liberally construed to the end that its purpose may be carried out, to wit: that the care, custody and discipline of a dependent or delinquent child as defined in this act shall approximate as nearly as may be that which should be given by its parents, and in all cases where it can be properly done, the dependent or delinquent child as defined in this act shall be placed in an approved family and may become a member of the family, by adoption or otherwise."

The jurisdiction of the juvenile court was held to be continuing in *In re Chartrand,* 103 Wash. 36, 173 Pac. 728, and in *State ex rel. De Bit v. Superior Court,* 103 Wash. 183, 173 Pac. 1014.

Since, under the provisions of § 1987-1 (quoted above), Margaret was a ward of the state on March 30, 1949, and her person was subject to the control of the juvenile court, we can conceive of no reason why the term "person" as used in Rem. Rev. Stat., § 2439, should not, under the facts of this case, be held to refer to the juvenile court. Indeed, to hold otherwise would impute to the legislature an intent to make it a crime to take a female under the age of eighteen years for the purpose of marriage without consent of her parent or guardian *only* in cases where the female had a parent or guardian or an individual custodian. In cases where such female was a ward of the state under the control of the juvenile court, the crime of abduction would not exist.

Such a construction would ignore the words of the abduction statute (Rem. Rev. Stat., § 2439) "or other person having legal charge of her person." Section 1987-1 specifically states that "their persons [dependent children] shall be subject to custody, care, guardianship and control of the [juvenile] court as hereinafter provided." Clearly, in the context of these statutes the consent of the juvenile court to this marriage was necessary, and appellant's failure to obtain it constituted a violation of § 2439. Therefore, the court's instruction was correct, and those proposed by appellant would have confused the jury as to the law applicable to this case by leaving to its determination the meaning of legal terms which it was the duty of the court to define.

By the terms of the order of December 1, 1948, Margaret was declared to be a dependent child and was made a ward of the court. She was remanded to the *temporary* custody of Mrs. Fraser, with whom she was to remain at least until the close of the 1949 school year. Jurisdiction over the welfare of Margaret was expressly reserved by the court in its order, as well as the right to make any further

or additional orders which might have been required. Did the court intend by this order to so divest itself of control over its ward as to give to Mrs. Fraser the power to consent to the marriage of Margaret? We are certain that it did not.

The extent of Mrs. Fraser's control was limited to the providing for Margaret's physical care, and did not include the making of such grave and vital decisions concerning her welfare as consenting to her marriage. To reach any other conclusion on the basis of this order would subvert the very broad powers which the legislature has seen fit to give the juvenile court over minor children and would ignore the wording of the order itself. It is true that Mrs. Fraser was never given a copy of the court's order, but she was present when it was orally rendered and must be held to have understood the full purport of it. There is no legal basis for appellant's argument that he needed only his mother's consent to take Margaret for the purpose of marriage in order to escape being punished for the crime of abduction. This would have been the effect of giving his proposed instruction No. 6, which the trial court properly declined to give to the jury.

If the juvenile court had intended by its order of December 1, 1948, to wholly divest itself of jurisdiction over Margaret, the order would have specifically so provided. *Mc-Clain v. Superior Court*, 112 Wash. 260, 191 Pac. 852. On the contrary, the juvenile court in this case expressly reserved jurisdiction over her to make any further orders that might be required.

We have carefully considered the entire record and are convinced that appellant had a fair trial. The jury was properly instructed, and, there being no error shown in the admission of evidence, its verdict must stand. Therefore, the judgment and sentence of the trial court entered herein must be, and it is, in all respects affirmed.

SIMPSON, C. J., BEALS, SCHWELLENBACH, and GRADY, JJ., concur.