[Nos. 7547-1-I; 7600-1-I. Division One. August 3, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. TODD JAMES WIXON, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. STEVEN EARL BROWN, *Appellant.*

64

*Lewis H. Nomura* of *Seattle–King County Public Defender Association* and *Tim Fogh,* for appellants (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Alan Paja* and *Sheryl Willert, Deputies,* for respondent.

JAMES, C.J.—This case involves a consolidated appeal from verdicts in two murder trials in which the principal issues concern media publicity. Todd J. Wixon appeals his conviction for first degree murder, second degree burglary, attempted second degree burglary, taking a motor vehicle without permission, and possessing stolen property in the second degree. Steven E. Brown appeals his conviction for second degree murder, attempted second degree burglary, and taking a motor vehicle without permission. We affirm.

The victim, a prominent Seattle citizen, was last seen alive on the evening of October 25, 1978. His body was found in the locked trunk of his car, which had been abandoned in West Seattle, on the following afternoon. An autopsy revealed death was caused by a single bullet wound in the neck. Police were initially baffled concerning the motives and identities of the killers. They soon found evi-

dence that the killers had attempted to break into the victim's home on the evening he was killed. Later, the police recovered the CB radio stolen from the victim's car. Each of these events was reported by the Seattle news media in accounts which the trial judge found to be factual and neither sensational nor prejudicial. Few of the newspaper stories were on the front pages or otherwise conspicuously placed, and none of these stories, of course, referred to either Wixon or Brown by name.

Wixon, Brown, and Alan Toshi, who later testified on behalf of the State, were arrested on November 29 and 30. On December 6, Wixon and Brown were formally charged. These events were also reported in news accounts which the trial judge found to be factual and nonsensational.

The exhibits include only two news accounts between December 11 and the opening of Brown's trial on February 16. A 4-paragraph article on January 25, not front page, reports the setting of the trial date and briefly reviews the allegations of the information and affidavit of probable cause. A newspaper article dated January 28 refers to neither defendant and mentions this case only in passing.

The trial judge granted separate trials for the two codefendants. Brown's trial in King County Superior Court began on February 16, and a guilty verdict was returned on February 24. The presentation of evidence, including Alan Toshi's testimony implicating both Wixon and Brown, was reported by the news media. Most news accounts mentioned Wixon as Brown's codefendant who was to be tried later. Only after voir dire and opening arguments disclosed that both the State and the defense theorized that the victim may have allowed Wixon and Brown to enter his car because he expected to engage in sexual relations with the defendants was this aspect of the case publicized by the media.

Wixon moved for a change of venue because of pretrial publicity. Jury selection began on March 5, and the trial judge reserved ruling on the motion until voir dire was completed, in order to determine if an unbiased jury could

be empaneled. Following individual voir dire, the trial judge denied the motion based upon his evaluation of the nature of the publicity, the selection of an apparently unbiased jury, and the benefits and burdens to the parties of granting a change of venue. We presume that Wixon's trial was the subject of ongoing news reports, although the record on appeal does not indicate their content.

Wixon and Brown first contend the trial–related publicity precluded their obtaining a fair trial by an impartial jury and thereby denied them due process of law. Wixon also contends more specifically that the trial judge erred in denying his motion for a change of venue on account of the publicity. We do not agree.

■■ In *Sheppard v. Maxwell*, 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966), the Supreme Court held that where trial–related publicity creates a probability of prejudice to the defendant, the defendant is denied due process of law if the trial judge does not take steps sufficient to ensure a fair trial for the defendant. *Accord, State v. Stiltner,* 80 Wn.2d 47, 491 P.2d 1043 (1971). Brown and Wixon contend that, here, a combination of "'[m]urder and mystery, society, sex and suspense," *Sheppard v. Maxwell, supra* at 356, as in *Sheppard,* resulted in a trial colored by prejudicial publicity. But it is the nature of the publicity and not the nature of the crime which primarily concerns us. Any excesses in media coverage of this case pale in comparison to press coverage accorded Sheppard's trial.[1]

---

[1]In *Sheppard v. Maxwell,* 384 U.S. 333, 16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966), a prominent Cleveland doctor was tried for murdering his wife. Even prior to his arrest, both newspaper articles and editorial commentary identified him as the prime suspect. Newspaper articles accused him of failing to cooperate with police, charged that he was "'getting away with murder'" because of delays in the investigation, asked, "'Why Isn't Sam Sheppard in Jail?'", reported the captain of the Cleveland police as urging his arrest, and accused him of having numerous affairs. *Sheppard,* at 339, 341. During trial, coverage continued in the same vein. One story even charged that Sheppard's slain wife had accused him of having a "'Jekyll–Hyde'" personality, *Sheppard,* at 357; no such evidence was adduced at trial. Detailed reports appeared concerning clues found by police but not placed in evidence. Many of the prejudicial and inadmissible items were traceable to the prosecution. Defense motions to question the jury concerning whether the jury

"An apparent probability of prejudice must be shown to demonstrate that a denial of a change of venue motion violated due process." *State v. Gilcrist,* 91 Wn.2d 603, 609, 590 P.2d 809 (1979). In *State v. Crudup,* 11 Wn. App. 583, 587, 524 P.2d 479 (1974), the criteria applicable to determination of whether a probability of prejudice exists on account of trial–related publicity are stated to be:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

An appellate court must make an independent review of the record to determine if the publicity gave rise to a probability of prejudice. *State v. Stiltner, supra.*

Our review of the record persuades us that the nature of the publicity in this case was factual and neither sensational nor inflammatory. With several isolated exceptions, reporting was restrained, especially given the nature of the crime. At Brown's sentencing hearing, his counsel could cite no specific example of media coverage which was either inflammatory or inaccurate.

Wixon and Brown focus considerable attention upon media references to them as being members of a youthful street gang and several other stories at approximately the same time which referred to criminal activity of street gangs generally and linking the gangs to Seattle's "unacceptable" robbery rates. Exhibit 1. But we discern

---

was aware of specific prejudicial comments were, with one exception, refused. On that occasion, two jury members were aware of specific "highly inflammatory" (and inadmissible) news stories.

neither a pattern of reports nor more than a single isolated instance in which media coverage suggested Wixon or Brown were or might be involved in other crimes for which they were not being tried.[2]

Wixon and Brown also contend that television appearances by the senior deputy prosecutor (who later tried the case), in which he read the affidavit of probable cause referring to statements and admissions of Brown, created a probability of prejudice. We do not agree.

█ Nevertheless, the practice is a questionable one which should be discouraged. The State's association with trial–related publicity is one factor to be considered in determining if a probability of prejudice has been created. *State v. Crudup, supra.* The State thus has an important responsibility in avoiding conduct which could reduce the likelihood of a fair trial, and the impact of television coverage of prosecutorial statements may in some cases be the decisive factor in persuading a court that a probability of prejudice exists.

The State asserts that the Code of Professional Responsibility, (CPR) DR 7–107(C)(9), which permits prosecuting attorneys to quote from the public record, authorizes such statements. The disciplinary rules merely establish standards which, if violated, subject the attorney to discipline. They do not establish the parameters of the constitutional right to a fair trial. Also, (CPR) DR 7–107(B)(1)–(6) identifies certain types of extrajudicial statements more likely to prejudice the defendant's right to a fair trial. (CPR) DR 7–107(B)(3) specifically provides that an attorney associated with the prosecution of a criminal case shall not, in any extrajudicial statement, refer to admissions or statements given by the accused. We do not discern that the possibility of prejudice to the defendant is any less merely

---

[2]One might infer from KING television's broadcast on December 7 that, "According to police the three are part of a loosely knit gang of young thugs responsible for many robberys [sic] in the area near the [P]ike [P]lace [M]arket," there was evidence Wixon and Brown were personally involved in other robberies in that area. Exhibit 8.

because those statements are enclosed within and quoted from a public record in the case.

Wixon and Brown also point to a number of reports dealing with the evidence of homosexuality presented in this case. The reports were factual, not inflammatory, and with one possible exception,[3] cannot be considered sensationalized coverage of a sensitive subject.

Brown points to a report in the Seattle Times on February 17 (at page A6) headlined, "Jury being chosen in death trial," exhibit 2, and containing two photographs, one of each defendant apparently in handcuffs and being led from the courtroom. The article also reported statements by the two prosecutors assigned to the case that the murder weapon had been found in a vehicle allegedly stolen by Wixon; that Brown and Wixon had been identified as the persons who sold the CB radio stolen from the victim's car, and that Brown had told a friend that the victim was killed during an attempted robbery and that Brown was holding the gun when it went off.

We find no apparent probability of prejudice based on this article. The report followed by 1 day the first day of jury voir dire, and preceded by 3 days the completion of the jury selection process. Brown's counsel had ample opportunity to make general inquiries of the prospective jurors as to whether they had seen any publicity concerning the case over the weekend or whether they had read or seen copies of the Times during that period—before a jury was empaneled. Counsel did not do so. We find no indications from the transcript of voir dire on February 20 that any prospective juror was exposed to the story or observed the photographs. We also note that evidence was presented at Brown's trial pertaining to each allegation reported in the article.

Neither defendant appears to have encountered special

---

[3]This exception is the lead sentence in KOMO television's February 22 news report: "The defense opens its case in the . . . murder trial . . . calling on people to give more insight into the sordid world of male prostitution." Exhibit 6.

difficulty in selecting a jury. The jury selection procedure used in both cases involved great care in excluding jurors who may have been influenced by publicity. Individual voir dire was employed in Wixon's case.

Brown did not find it necessary to exercise all his peremptory challenges; Wixon did use all of his. But before ruling on Wixon's motion for a change of venue, the trial judge inquired of his counsel if he would have exercised additional peremptory challenges, if available, to jurors because of indications they had knowledge of the case. Wixon's counsel could identify no juror as to whom he would have exercised an additional peremptory challenge on that basis.

We agree with the trial judge's assessment of the impact of the publicity upon the prospective jurors:

> It is apparent from the questioning of the prospective jurors that only a general impression of the case was imparted by the publicity. And that includes many of those who were excluded. While most of the jurors had heard of the case, they were not biased by the information. For the most part, they did not recall in sufficient detail to indicate that they would confuse the prior information that they had with evidence they would receive at the trial. The juror's [*sic*] who indicated a possibility of bias were excused by the Court. No challenge for cause was necessary but they were allowed upon the suggestion of such bias by counsel or any objection raised as to a prospective juror during the course of the preliminary voir dire was answered by granting the challenge and excusing the juror. This would indicate that those selected to serve were not influenced by by [*sic*] the publicity in the estimation of counsel and the Court.

Also, there was a substantial lapse of time (about 9 weeks) between the last significant news coverage of the case and the opening of Brown's trial. Wixon's trial followed Brown's trial by approximately 2 weeks.

Consideration of the remaining factors recognized in *State v. Crudup* provides us no additional indicia of probable prejudice to either Brown or Wixon on account of publicity concerning the case. Even considering the short

time period between the trials of Brown and Wixon, the factual, noninflammatory nature of the publicity and the extensive voir dire record persuades us that the news coverage of Brown's trial created no probability of prejudice against Wixon. Neither Brown nor Wixon was denied a fair trial by an impartial jury, and the trial judge did not err in denying the motion for a change of venue.

The trial judge permitted television coverage of both defendants' trials over their objections. Brown and Wixon contend that the televising of their trials denied them due process of law.[4] We do not agree.

■ A defendant is not denied due process merely because his trial is televised. *Chandler v. Florida,* 449 U.S. 560, 574–75, 66 L. Ed. 2d 740, 101 S. Ct. 802, 810 (1981):

> An absolute constitutional ban on broadcast coverage of trials cannot be justified simply because there is a danger that, in some cases, prejudicial broadcast accounts of pretrial and trial events may impair the ability of jurors to decide the issue of guilt or innocence uninfluenced by extraneous matter. The risk of juror prejudice in some cases does not justify an absolute ban on news coverage of trials by the printed media; so also the risk of such prejudice does not warrant an absolute constitutional ban on all broadcast coverage. A case attracts a high level of public attention because of its intrinsic interest to the public and the manner of reporting the event. The risk of juror prejudice is present in any publication of a trial, but the appropriate safeguard against such prejudice is the defendant's right to demonstrate that the media's coverage of his case—be it printed or

---

[4]The Code of Judicial Conduct, Canon 3(A)(7) provides for such coverage:

"(7) A judge may permit broadcasting, televising, recording, and taking photographs in the courtroom during sessions of the court, including recesses between sessions, under the following conditions:

"(a) Permission shall have first been expressly granted by the judge and under such conditions as the judge may prescribe;

"(b) The media personnel will not distract participants or impair the dignity of the proceedings; and

"(c) No witness, juror, or party who expresses any prior objection to the judge shall be photographed nor shall the testimony of such a witness, juror, or party be broadcast or telecast."

broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly.

To demonstrate a denial of due process, a defendant must present some specific evidence that televising the trial adversely affected the conduct of his trial.

> To say that the appellants have not demonstrated that broadcast coverage is inherently a denial of due process is not to say that the appellants were in fact accorded all of the protections of due process in their trial. As noted earlier, a defendant has the right on review to show that the media's coverage of his case—printed or broadcast—compromised the ability of the jury to judge him fairly. Alternatively, a defendant might show that broadcast coverage of his particular case had an adverse impact on the trial participants sufficient to constitute a denial of due process. Neither showing was made in this case.
>
> To demonstrate prejudice in a specific case a defendant must show something more than juror awareness that the trial is such as to attract the attention of broadcasters. *Murphy* v. *Florida,* 421 U.S. 794, 800 [44 L. Ed. 2d 589, 95 S. Ct. 2031] (1975). No doubt the very presence of a camera in the courtroom made the jurors aware that the trial was thought to be of sufficient interest to the public to warrant coverage. Jurors, forbidden to watch all broadcasts, would have had no way of knowing that only fleeting seconds of the proceeding would be reproduced. But the appellants have not attempted to show with any specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them or that their trial was affected adversely by the impact on any of the participants of the presence of cameras and the prospect of broadcast.

*Chandler v. Florida,* 449 U.S. at 581, 101 S. Ct. at 813. Here, neither Wixon nor Brown has offered any evidence that the televising of their trials impaired the ability of the jurors to decide the case on the basis of the evidence presented or that the trial was affected adversely by the impact of the broadcasters' presence on any of the participants.

Wixon and Brown contend also that the trial judge erred in denying defense motions to sequester the juries during

their respective trials because of publicity concerning the case. We do not agree.

CrR 6.7 provides, "The jury may be allowed to separate if the court finds that good reason exists to believe that such would not jeopardize a fair trial." Although a trial judge has broad discretion in making this determination, sequestering the jury may be necessary to prevent prejudice to the defendants because of ongoing publicity. *State v. Cunningham*, 93 Wn.2d 823, 613 P.2d 1139 (1980). A defendant need not demonstrate actual prejudice to establish that the trial judge erred in denying jury sequestration. *State v. Cunningham*, 27 Wn. App. 834, 620 P.2d 535 (1980) (case on remand).

■■ The purpose of sequestering a jury is to protect jurors from outside influence, *during the course of a trial,* which might affect their verdict. *State v. Harris*, 99 Wash. 475, 169 P. 971 (1918); *State v. Cunningham*, 27 Wn. App. 834, 620 P.2d 535 (1980). A defendant's assertion that he was prejudiced because his jury was not sequestered must be considered in light of this purpose. A defendant cannot claim error in the denial of a motion for a change of venue if he can point to nothing in the record, other than the mere existence of publicity concerning the case, which indicates he may have been prejudiced. *State v. Malone*, 75 Wn.2d 612, 452 P.2d 963 (1969). No lesser showing ought to be required when a defendant contends his jury should have been sequestered. Unless the record indicates that either the nature of the publicity during the trial or the jury's exposure to that publicity created a probability of prejudice, the trial judge has not abused his discretion under CrR 6.7.

Here, the trial judge had "good reason" to believe separation would not jeopardize a fair trial. CrR 6.7. The publicity was factual and not sensational, focusing upon the evidence presented during the course of the trial. It appeared that both trials could be lengthy, and Brown's trial extended over a holiday. The trial judge was concerned that a lengthy sequestration could prejudice the defendants. The trial judge also believed (correctly, it appears)

that media coverage peaked during Brown's trial and would lessen during Wixon's trial.

▪ At Brown's sentencing hearing, his counsel could identify no specific examples of inaccurate or inflammatory reports or give any indication that jurors were exposed to any news accounts of the case. The record in Wixon's case is even less specific; we are provided with no exhibits relevant to media coverage of his trial. Moreover, the trial judge gave proper instructions to the jury, before each separation, that they were not to view, read, or listen to news reports. The jury is presumed to follow such instructions. *State v. Braun*, 82 Wn.2d 157, 509 P.2d 742 (1973); *State v. Trickel*, 16 Wn. App. 18, 553 P.2d 139 (1976). Neither defendant has shown that jurors were exposed to such publicity during the trial or that the publicity during the trial was of such a sensational or prejudicial nature that mere risk of exposure created a probability of prejudice. The trial judge did not err in failing to sequester the juries.

▪ Brown contends the trial judge erred in denying a defense motion for individual voir dire because of publicity in the case. This procedure allows counsel to examine each potential juror concerning his or her exposure to publicity, outside the presence of other potential jurors. It is recognized in Washington, *State v. Herman*, 93 Wn.2d 590, 611 P.2d 748 (1980); *State v. Frederick*, 20 Wn. App. 175, 579 P.2d 390 (1978); *State v. Wilson*, 16 Wn. App. 348, 555 P.2d 1375 (1976), and was employed in selecting the jury for Wixon's trial. The procedure affords both trial and appellate courts a greater opportunity to determine if a probability of prejudice exists because of pretrial publicity.

Individual voir dire is not, however, necessary in all cases where publicity is a factor:

> We have previously recognized this procedure, but found it unnecessary where the news stories contained factually accurate material of a relatively nonsensational nature and, for the most part, told the public (prior to trial) only those basically essential facts of the crimes which would ultimately be presented to the jurors in the controlled atmosphere of the courtroom.

*State v. Wilson,* 16 Wn. App. 348, 354, 555 P.2d 1375 (1976).

(Footnote omitted.) *State v. Frederick, supra* at 179–80. In light of the factual, nonsensational news coverage here and the 9–week delay between the last significant publicity concerning the case and Brown's trial, we conclude the trial judge did not err in denying Brown's motion.

Wixon and Brown next contend the trial judge erred by failing to instruct the jurors that their verdicts must be unanimous as to whether the defendant acted as the principal or the accomplice. We do not agree.

■ A unanimous verdict is required only if separate crimes are charged, but not when alternative means of committing a single crime are charged where the alternative means are not repugnant to each other. *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976). An accomplice is not charged with two crimes; he is charged with, and liable for, a particular crime committed by his principal. RCW 9A.08-.020. Nor is aiding in the commission of a crime a method or mode of committing that crime, and the elements of the offense remain the same whether the defendant is alleged to have acted as principal or accomplice. *State v. Carothers,* 84 Wn.2d 256, 525 P.2d 731 (1974). The jury was not required to unanimously determine if either defendant acted as principal or accomplice. *State v. Carothers, supra; Holland v. State,* 91 Wis. 2d 134, 280 N.W.2d 288 (1979).

A fellow inmate at the King County jail was called to testify at Brown's trial. Defense counsel made a general objection following this question by the prosecutor: "[D]id you have any conversation with Mr. Brown about the shooting when you were in jail?" This objection was overruled, and the inmate was allowed to testify, without further specific objection, that he had a conversation with Brown and that Brown "[j]ust told me about what is going to happen, what he is going to try to play for."

■ This assignment of error will not be considered. "It is well settled that an objection must apprise the [trial] court of the ground upon which it is made, otherwise no

error can be predicated upon it." *State v. Severns,* 19 Wn.2d 18, 20, 141 P.2d 142 (1943). *Accord, State v. Speer,* 36 Wn.2d 15, 216 P.2d 203 (1950); *State v. Myers,* 6 Wn. App. 557, 494 P.2d 1015, *cert. denied,* 409 U.S. 1061, 34 L. Ed. 2d 513, 93 S. Ct. 562 (1972).

The State was also prepared to present testimony by Brown's girlfriend, relating to a conversation in which Brown had told her he was in a car and "the gun went off," but prior to trial, the girlfriend at one point repudiated her earlier statements. Before the adoption of ER 607,[5] a party generally could not impeach its own witness. *E.g., Ferris v. Todd,* 124 Wash. 643, 215 P. 54 (1923). This was the so-called "voucher" rule, by which a party "vouched" for or guaranteed the credibility of its own witnesses. 3A J. Wigmore, *Evidence* § 898 (1970). In order to obviate the necessity of either party vouching for the witness' credibility and to place the witness' testimony before the jury, the trial judge called the girlfriend as the court's witness (but did not ask questions of the witness).

Brown contends that the trial judge erred in calling the girlfriend as a witness of the court. We do not agree.

A trial judge's authority to call witnesses in a criminal prosecution is generally recognized, and the trial judge may in his discretion call witnesses for whom neither the State nor the defense is willing to vouch. 81 Am. Jur. 2d *Witnesses* § 3 (1976); *United States v. Lutwak,* 195 F.2d 748 (7th Cir. 1952), *aff'd,* 344 U.S. 604, 97 L. Ed. 593, 73 S. Ct. 481 (1953); *State v. Adams,* 62 Ohio St. 2d 151, 404 N.E.2d 144 (1980); *State v. Ferrari,* 112 Ariz. 324, 541 P.2d 921 (1975); *Patterson v. State,* 22 Md. App. 13, 321 A.2d 544 (1974); E. Cleary, *McCormick on Evidence* § 8 (2d ed. 1972). Here, the trial judge did not abuse his discretion in calling the witness.

This practice has since been specifically approved in Washington by the adoption of ER 614(a), which provides:

---

[5]ER 607 provides: "The credibility of a witness may be attacked by any party, including the party calling him."

The court may, on its own motion where necessary in the interests of justice or on motion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.

Brown also contends the trial judge erred in denying his motion to strike testimony by the girlfriend relating to her conversation with Brown. On appeal, Brown contends the statements constituted prejudicial hearsay.

 Our review of the record indicates that counsel objected to the testimony on relevancy grounds and that no hearsay objection was made. We doubt that a hearsay objection could properly have been sustained, *see Drumheller v. Nasburg*, 3 Wn. App. 519, 475 P.2d 908 (1970); ER 801(d)(2), but hold only that no hearsay objection was preserved for appeal. *State v. Severns, supra.*

The judgment is affirmed.

CALLOW and ANDERSEN, JJ., concur.

Reconsideration denied August 27 and September 10, 1981.

Review denied by Supreme Court November 6, 1981.