IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38671-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RAYMOND LAPEER BELL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J.P.T.[*] — Raymond Bell appeals his conviction for first degree assault with a deadly weapon, challenging the sufficiency of the evidence and alleging a violation of his right to a fair and impartial jury, evidentiary error, and an abuse of discretion in denying his request for an exceptional mitigated sentence. The evidence was sufficient, his standard range sentence is not appealable, and he fails to identify any error or abuse of discretion. For those reasons, and because he raises no meritorious issues in a statement of additional grounds, we affirm his judgment and sentence other than to grant his request for relief from the victim penalty assessment based on a recently-effective change in the law.

---

[*] Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter. She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.

FACTS AND PROCEDURAL BACKGROUND

On an evening in March 2019, a woman who identified herself as "Shanna" called 911 to report that she had just been assaulted. The call was transferred by the 911 operator to a Spokane police dispatcher. Shanna had just begun speaking to the dispatcher when she abruptly told the dispatcher that her attacker had come back into the apartment. She ceased responding to questions. All the dispatcher could hear were muffled voices. Spokane police responded to the address provided to the 911 operator and found Shanna Delcambre in an upstairs apartment with a deep head wound and her right hand almost completely severed. She told police that Raymond Bell had repeatedly attacked her with a machete.

Mr. Bell was located in a first-floor hallway of the apartment building and was taken into custody. The State charged him with first degree assault with a deadly weapon, later amending the information to add a charge of attempted first degree murder.

The case proceeded to trial in October 2021. Among Mr. Bell's pretrial motions in limine were several related to the then-ongoing coronavirus disease 2019 (COVID-19) pandemic. He moved for two additional alternate jurors, the explanation being, "There should be additional alternates on the jury due to the risk of COVID-19 Delta infection." Clerk's Papers (CP) at 18. He requested "additional time to investigate juror biases and strike jurors for cause," including "for those who indicate they will be distracted by the surrounding issues with the COVID[-]19 pandemic." *Id.* at 19 (boldface omitted). He

2

submitted that "[j]urors who concede that their ability to focus on the testimony is impaired by the pandemic must be stricken for cause." *Id.* at 22.

He objected to witnesses wearing masks while testifying as violating his right of confrontation. Finally, he objected to jurors wearing N95 or other face masks during voir dire, asking that they wear face shields instead.

It was the practice of the superior court at the time for *witnesses* not to wear face masks when testifying. For jurors and prospective jurors, the practice was for them to wear face masks. When the parties' motions in limine were heard, Mr. Bell's request that the jurors not wear face masks was his only COVID-related request that was not accommodated or resolved with defense agreement. The court explained:

> The record should reflect that—so sad I had to update this because it was the fourth wa[ve], now it's the fifth wa[ve], our community is currently in what's been characterized as the fifth [wave] of a global pandemic caused by the deadly Corona virus, which has killed—and back then it was over a half million, but I know that we are at 700-and-something-thousand U.S. citizens and infected millions more. *Spokane County Health Department figures reflect, and this was yesterday's numbers, so I'm sure that, or I would not be surprised if it did clear 67,000 cases because as of yesterday evening, it was 66,988 cases with 4,219 overall hospitalizations. Less than half of Spokane County is vaccinated.*
>
> While the defendant has a right to a timely jury trial, *I also have to weigh the safety of the citizens that the court is compelling to attend jury service. CDC*[1] *face shield provided sufficient protection while advising N95 mask with social distancing provides the best protection against transmission, particularly important with the even more contagious Delta*

---

[1] Centers for Disease Control and Prevention.

> *variant. And in addition to that, Governor Inslee has instituted an indoor mask mandate.*
>
> For those reasons, I am going to deny defense number 9. I can't tell you how much I wish we weren't in this position still, but, unfortunately, we are.

1 Rep. of Proc. (1 RP) at 26-27 (emphasis added).[2]

In jury selection the next week, the court began by talking to prospective jurors about the pandemic-related safety protocols in place. Face masks were provided, and jurors were told by the court that "[f]ace coverings are required for protection in the courtroom." 1 RP at 59-60. The court added, "I will not have my face covering on while I'm talking during voir dire, and counsel will be allowed to remove their face covering while speaking." *Id*. at 60. When the time came for jurors to answer questions, the court said, "[W]e'll start with Juror No. 1. If you could lower your face covering while you're speaking. It will help with the court reporting." *Id.* at 67. During the questioning, prospective jurors were periodically reminded or requested to lower their face coverings when speaking. *See, e.g.*, 1 RP at 78, 81, 97, 109.

After the jury was selected, three days of testimony ensued. There had been three witnesses to the assault: the victim, Shanna Delcambre; the defendant, Mr. Bell; and

---

[2] Our record on appeal includes three separately paginated reports of proceedings. We refer to the volume that includes the hearing on the parties' motions in limine and the first day of trial (reported by Rebecca J. Weeks) as "1 RP." We refer to the volume that includes the remainder of trial, the sentencing hearing, and a couple of early pretrial hearings (reported by Terri Rosadovelazquez) as "2 RP." We refer to the volume that includes other hearings discussed in addressing Mr. Bell's statement of additional grounds (reported by Korina C. Cox) as "3 RP."

Dorothea George, Mr. Bell's longtime girlfriend and his roommate at the time of the assault. Ms. George and Ms. Delcambre were called as witnesses in the State's case.

*Dorothea George testimony*

Of the witnesses to the assault, Ms. George testified first. She testified that on the day of the assault, Mr. Bell had been awake and upset for days, following a suspension from work. For four days, he had been drinking and smoking crack cocaine. She testified she had finally gotten Mr. Bell to sleep when, late in the afternoon, she heard an altercation in a parking area below their upstairs apartment. She looked out a window and saw Ms. Delcambre, who she recognized; she, Ms. Delcambre, and Mr. Bell had been friends, decades earlier, in high school. Ms. George shook Mr. Bell awake and together they went downstairs to calm down whatever was going on between Ms. Delcambre and a man with whom she was arguing. After things settled, Ms. George and Mr. Bell walked across the street to purchase beer and malt liquor and invited Ms. Delcambre to join them upstairs. The three began drinking and smoking weed in the apartment. Ms. George estimated that Ms. Delcambre was with them in the apartment for about three hours.

Ms. George testified that an argument started when Ms. Delcambre mentioned a girl they had gone to school with and Mr. Bell commented that the girl had been "pretty back in the day," which Ms. Delcambre felt disrespected Ms. George. 2 RP at 38. When Ms. Delcambre asked Mr. Bell how he would feel if Ms. George talked wistfully about

5

her old boyfriend's "stuff," 2 RP at 38, Mr. Bell told her to be quiet, which made Ms.

Delcambre angrier. According to Ms. George, the argument between Mr. Bell and Ms.

Delcambre escalated and became a physical fight. Mr. Bell told Ms. Delcambre, "Get the

'F' out of my house," but Ms. Delcambre did not leave. 2 RP at 40. Ms. George then

yelled for them both to leave, but only Mr. Bell walked out. Ms. Delcambre began to call

the police, while Ms. George pleaded with her not to.

Ms. George assumed Mr. Bell heard Ms. Delcambre calling the police, because he

came back into the apartment and followed Ms. Delcambre into the bedroom. Ms.

George testified that she stayed in the living room until she heard Ms. Delcambre

screaming her name. When she entered the bedroom, she thought the two were fighting

like before, but she soon saw that Mr. Bell was "just chopping and chopping" at Ms.

Delcambre with a machete. 2 RP at 43. Ms. George jumped in front of Mr. Bell, yelling

at him to stop. She testified that his eyes were blank and he appeared not to hear her;

according to Ms. George, "[H]e didn't know what the hell he was doing." 2 RP at 79.

When she grabbed him and called him "Daddy," he "stop[ped], froze, and looked around,

and he was like, What the . . . ." 2 RP at 80. Ms. George testified Mr. Bell then left the

apartment and never returned. Ms. George saw Ms. Delcambre was holding her wrist so

she wrapped her hand in a shirt while calling 911.[3]

---

[3] No recording of this 911 call was offered as evidence, but a dispatcher testified that the caller stated her friend needed help and then hung up.

According to Ms. George, Mr. Bell "wasn't even mentally there" during the assault, and did not know what was going on.  2 RP at 42.  She believed Mr. Bell was "blacked out" that night.  2 RP at 55.  She had seen Mr. Bell black out before and said he would go entirely blank and be nonresponsive until he was shaken.

*Shanna Delcambre testimony*

Ms. Delcambre testified that she had been at the apartment building on the afternoon and early evening of the assault with her cousin, who was helping to change tires on the car of one of Ms. Delcambre's friends.  It took "at least a couple hours." 2 RP at 116.  The altercation that caused Ms. George to look out the window happened when Ms. Delcambre's friend's boyfriend started flirting with Ms. Delcambre, and she "told him off."  2 RP at 113.  According to Ms. Delcambre, Ms. George came to a window and yelled down, "Oh girl, I thought that was you; I heard your voice."  2 RP at 115.  The two talked briefly from that distance and then Ms. George came down to the parking lot.  They shared a beer and chatted.  Shortly after, Mr. Bell also came down and briefly joined them before leaving to buy beer.

When the tires were finally changed, it was about dusk and Ms. Delcambre needed to use a bathroom.  She accepted Ms. George's invitation to use the bathroom in her and Mr. Bell's apartment and stayed to visit with them when she was done.  Ms. George offered Ms. Delcambre another beer and the three sat and talked, telling jokes and laughing.  According to Ms. Delcambre, Mr. Bell and Ms. George continued to drink

7

heavily even though, by her account, they were already "pretty drunk." 2 RP at 121. Ms. Delcambre believed she only had two beers total that night.

About an hour and a half into the visit, there was a sudden shift in the mood, according to Ms. Delcambre. She recalled them all laughing at something Ms. George said and then Mr. Bell stood up and "shook me really hard," demanding to know what Ms. Delcambre was laughing at. 2 RP at 123. Ms. Delcambre was irritated and said something like, "Hey, don't shake me like that. You know, keep your hands off me; I'm not Dorothea." 2 RP at 181. Ms. Delcambre acknowledged at trial that she has a strong personality and does not back down easily.

Ms. George told Ms. Delcambre, "Don't pay him no mind, you know, don't leave," so Ms. Delcambre decided to ignore Mr. Bell. 2 RP at 125. She shifted her attention back to Ms. George while Mr. Bell got up and went to the bedroom. When he returned, he was carrying a machete in a sheath. Initially, she assumed he was just going to show it to them. However, she became worried when he took it out of the sheath, started playing with it, and was laughing.

Ms. Delcambre struggled to remember her 911 call, testifying she believed she called 911 while running into the bedroom. The recorded 911 call was admitted into evidence and played for the jury. On it, Ms. Delcambre sounds calm and reports that she was just assaulted and Mr. Bell had a machete. She seems to say that Mr. Bell was "jumping on" Ms. George as well. Ex. P-12, at 59 sec. to 1 min., 4 sec.; *see also* 2 RP at

8

194 ("I'm calling because I think my friend is in danger.").  The recording ends as the

call is being transferred to dispatch and Ms. Delcambre says she was just "socked" in the

head multiple times.  Ex. P-12, at 2 min., 2 sec. to 2 min., 6 sec.

Ms. Delcambre did remember that after the call she ran to the bedroom and tried to

shut the door but was followed by Mr. Bell who kicked the door in.  She described the

attack that followed:

> I went into the bedroom.  He came in.  I was trying to close the door.  He kicked in the door.  So when he came in, there was nowhere else to go, so I went towards the closet.  I went into the closet.  I was in the corner of the closet, and that's—I just kept saying, Okay, Raymond, the police are on their way.  You should just leave.  Raymond, the police are on their way.  And he started chopping at me.  And when he hit my hand, I just was so puzzled that he had did it.  He was still laughing.  So I just was, like, Raymond, you really—like, you really did—like, my hand's on the ground—or seemed like it was on the ground to me.  I'm, like, it was gone from my wrist.
>
> So I just kept trying to talk him down and tell him that the police were leaving—I mean, were coming, whatever.
>
> And so he had attacked me.  And I don't know if the door closed, like, because I was in the closet, so I don't know if it kind of closed or if it kind of came off of the track, but I kept trying to crawl in further and like, leave my—oh, God, I was so scared to have any limbs out.  I just didn't want him to cut another one off.
>
> So I was just trying to get in the closet as tight as I could.  And it just seemed like he got tired and the door kind of got in his way, and he just walked away.  And I just thought, Oh, God, it's over, like, God, they should be here soon, like—and then the next thing I know, he was coming back.

2 RP at 132-33.  She said Mr. Bell "looked like the Joker" and "act[ed] like he was

jousting and laughing" as he jabbed her.  2 RP at 183, 174.  Following the blow to her

wrist, Ms. Delcambre said it "just kept squirting like a faucet." 2 RP at 143. She had never seen so much blood.

Ms. Delcambre estimated it was only minutes after he left that Mr. Bell came back and started attacking her again. He chopped her in the head, cutting through her skull and slicing off some of her hair. During the second attack, Ms. Delcambre "felt then that he was trying to kill me," so she pretended he had, after the first blow. 2 RP at 142. When Mr. Bell struck her again, she kept her eyes closed and acted like she did not feel anything even though she did. Mr. Bell finally left when Ms. George came into the bedroom and told him to stop.

*Other State witnesses*

The State's other witnesses were the Spokane Police Department dispatcher, three Spokane police officers who responded to the 911 call, the assigned detective, an emergency physician from Sacred Heart Hospital in Spokane, and a hand surgeon from Harborview Medical Center.

The first police officer to respond to the 911 call found Ms. Delcambre in the Bell/George apartment, lying inside the back-bedroom closet blood soaked, and holding a towel to her hand. He immediately applied a tourniquet, which her doctors testified saved Ms. Delcambre from dying from loss of blood.

Medical witnesses testified that Ms. Delcambre's injuries were extensive and life-threatening. Her right hand was nearly entirely cut off at the wrist and required multiple

10

surgeries to reattach. She had a laceration on her left thumb and a laceration to her scalp that was two and a half to three inches deep. Both required staples to repair. She suffered a traumatic brain injury and continued to have memory issues.

Responding officers found Mr. Bell in the first-floor hallway of the building. Officers testified that he appeared intoxicated, but also described him as not incapacitated in any respect. Corporal Brandon Lynch observed Mr. Bell's communications with others, and testified that Mr. Bell was responsive, cooperative, and not confused. Officer Benjamin Yinger observed Mr. Bell comply with directions to show his hands and get on the ground. He, too, testified that Mr. Bell did not appear confused. When Officer Yinger interviewed Ms. George, she told him Mr. Bell had been on a four-day bender, but did not tell Officer Yinger about any blackout.

Detective Paul Lebsock testified that if Mr. Bell had needed medical clearance or treatment for intoxication, it would have been documented, and there is no indication that anything of that sort occurred. The topic of intoxication came up in the detective's direct examination. The prosecutor was questioning him about defenses he considers when engaged in an investigation, and the following testimony is identified as an issue on appeal:

> Q.   So in general, what types of defenses do you think of as part of your investigation?
>
> A.   Sure. Well, everybody has the right to defend themselves and another person from being attacked or unlawful injury, unlawful

11

> assault. So you consider physical size. You do consider gender differences. You consider available weapons. You consider who might be the primary physical aggressor and then an appropriate level of defense to the point of self-defense without crossing the line into counteractive assault.
>
> . . . Let's say you have two individuals and one individual comes up and kind of shoulder bumps a kid in a hallway of the high school. . . . And the kid that gets shoulder bumped pulls a gun and shoots the guy. That's an example of overstepping one's boundary of self-defense.

Q. Pursuant to law enforcement evaluation?

A. Yes. The way we would interpret the law. We don't write the law, but we try to interpret the law and work within the law with what the legislative branch has put forward.

Q. But these are the types of things you look—you consider when you're going into any type of an incident such as one like this?

A. Sure. You evaluate levels of force that's appropriate in defense of one's self or another.

Q. And then what about intoxication, does that ever play into your analysis?

A. So our role is to look at the law the way the law is written, and, really, intoxication is not—

[DEFENSE COUNSEL]: Objection, Your Honor. This is law that the judge is going to be instructing on, not testimony of this witness.

THE COURT: Right. If we could shift to a different . . .

[PROSECUTOR]: Will do.

2 RP at 292-94. Defense counsel did not move to strike the aborted testimony or request any curative instruction.

12

*Raymond Bell testimony*

Mr. Bell was the only witness called in the defense case. He testified that he could not remember what happened on the night he assaulted Ms. Delcambre because he was drunk and had been binge drinking for a few days. He testified that he had also been smoking crack cocaine for about a day.

He recalled seeing Ms. Delcambre outside in the parking lot, and knew she came up to his apartment with her dog. He remembered going to the store to buy beer. He remembered sitting on the couch with Ms. George while Ms. Delcambre sat on a chair. He remembered watching television, smoking a cigarette, talking, and drinking a beer. He said the last thing he remembered before blacking out was the three of them just talking.

He testified he did not recall being snapped out of the blackout by Ms. George. He claimed his next memory after just talking was someone putting handcuffs on him, and sleeping in the jail for four days. He had no injuries from the incident. He testified he had not wanted to hurt or kill Ms. Delcambre and did not intentionally assault her.

*Verdict, sentence and appeal*

The jury was unable to reach a verdict on the attempted murder charge, but found Mr. Bell guilty of first degree assault with a deadly weapon.

At sentencing, Mr. Bell's offender score of 8 resulted in a standard range of 209-277 months. With the 24-month deadly weapon enhancement, his total standard range

was 233-301 months.  The State recommended a high end sentence of 301 months, while

Mr. Bell requested consideration of an exceptional sentence below the standard range.

He offered five possible mitigating factors, the first being his age—55—which he

argued meant he had, or soon would, age out of criminal behavior.  He argued that a

lengthy sentence would waste State resources by burdening it with medical expenses and

others costs, and fail to give Mr. Bell "the chance of an opportunity to improve himself."

2 RP at 436.  He submitted that the fact that he came from a low socioeconomic class,

was a person of color, and had a criminal history spanning the majority of his life, should

call into question "how the system and failures in our criminal justice system had affected

his offender score."  2 RP at 437.  He argued that the trial evidence revealed Ms.

Delcambre to be "an initiator, willing participant, aggressor, or provoker of the incident."

2 RP at 437-38.  Finally, he expressed remorse and testified that the assault was "not

something he ever intended to do."  2 RP at 439.

The trial court denied the request for an exceptional sentence and sentenced Mr.

Bell to 250 months for the first degree assault conviction and 24 months for the deadly

weapon enhancement, for a total period of confinement of 274 months. Mr. Bell appeals.

He recently filed a motion seeking leave to file a supplemental assignment of error, and

we have granted him leave to assign error supplementally to the trial court's imposition

of the $500 victim penalty assessment provided by former RCW 7.68.035(1)(a) (2018).

ANALYSIS

Mr. Bell makes four assignments of error. He challenges the denial of his motion to require face shields rather than face masks for jurors, Detective Lebsock's interrupted answer to the question about intoxication, the sufficiency of the evidence, and the court's refusal to impose an exceptional sentence.

I.     USE BY PROSPECTIVE JURORS OF FACE MASKS DURING VOIR DIRE DID NOT VIOLATE MR. BELL'S RIGHT TO AN IMPARTIAL JURY

Mr. Bell's first assignment of error is that the trial court violated his constitutional right to a fair trial before an impartial jury by denying his objection to prospective jurors wearing N95 or other masks during voir dire.[4]

Both the United States and Washington State Constitutions provide a right to trial by an impartial jury in all criminal prosecutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Seating a biased juror violates the right. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (citing *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015)). A juror demonstrates actual bias when he exhibits "a state of mind . . . in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). Voir dire, the part of jury selection wherein

---

[4] He characterizes his motion as having objected to jurors wearing masks throughout the entirety of the criminal case, but his motion in limine spoke only of voir dire and relied on reasoning that applied only to voir dire. *See* CP at 24-26. Any objection to jurors wearing face masks during trial is unpreserved. RAP 2.5(a).

15

the parties ask questions and engage in discussion with potential jurors to draw out potential bias, is central to securing the right to an impartial jury. *State v. Bell*, ___ Wn. App. 2d ___, 529 P.3d 448, 454 (2023) (citing *State v. Momah*, 167 Wn.2d 140, 152, 217 P.3d 321 (2009)). The ability to assess the demeanor of the venire, and of the individuals who compose it, is a factor of critical importance in assessing the attitude and qualifications of potential jurors. *Uttecht v. Brown*, 551 U.S. 1, 9, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007).

A second purpose of voir dire is to "gain[ ] knowledge to enable an intelligent exercise of peremptory challenges." *State v. Lupastean*, 200 Wn.2d 26, 35, 513 P.3d 781 (2022) (quoting CrRLJ 6.4(b)). Unlike constitutionally-required challenges for cause, however, peremptory challenges are "merely one rule-based component of the trial process, which must be limited by courts and may be eliminated altogether." *Id.* at 43.

Trial courts are vested with broad discretion to see that voir dire is effective in obtaining an impartial jury and that this result is obtained with reasonable expedition. *State v. Brady*, 116 Wn. App. 143, 146-47, 64 P.3d 1258 (2003) (citing *State v. Frederiksen*, 40 Wn. App. 749, 753, 700 P.2d 369 (1985)). The court's discretion is limited only by the need to assure a fair trial by an impartial jury. *Brady*, 116 Wn. App. at 147 (citing *Frederiksen*, 40 Wn. App. at 752). We review a trial court's ruling on the conduct of voir dire for an abuse of discretion. *Id.*

Mr. Bell provides no legal authority from any jurisdiction holding that requiring face masks for public safety during voir dire violates a criminal defendant's right to an impartial jury. The issue has been addressed, as pointed out by the State's response brief, and the universal response has been that a defendant is able to assess a juror's credibility and demeanor while the juror is wearing a face mask. *See* Br. of Resp't at 36-40 (collecting cases).

Following the parties' briefing on appeal, Division One of our court addressed an identical challenge by a different defendant named Bell, who also moved his trial court to employ face shields rather than face masks for the voir dire process. *Bell*, 529 P.3d at 454. Like the State's briefing in this case, Division One observed that courts that have seen challenges to their jurisdiction's pandemic-induced jury selection procedures "have uniformly rejected these challenges." *Id.* at 456. *Bell* points out that a common theme in courts' treatment of such challenges, with which the *Bell* court agreed, is that "parties' inability to see a juror's mouth and nose deprives them of access to only a small part of their demeanor." *Id.* at 457 (citing cases). Another common theme with which Division One agreed is the "countervailing need to provide for safety of all participants in the midst of a pandemic." *Id.* at 457-58 (citing cases).

As recounted in *Bell*, Washington courts adopted a variety of strategies to ensure that trials could go forward safely during the pandemic. In an order issued in June 2020, the Washington State Supreme Court required courts to "conduct all [jury trial]

17

proceedings consistent with the most protective applicable public health guidance in their

jurisdiction." Ord. re: Modification of Jury Trial Proc., *In re Statewide Response by

Washington State Courts to the COVID-19 Public Health Emergency*, No. 25700-B-631,

at 3 (Wash. June 18, 2020). As pointed out in *Bell*, the Supreme Court's order

contemplated face masking and explicitly permitted the use of remote technology in jury

selection, a dramatic change to the usual voir dire procedure, to reduce the risk of

coronavirus exposure. *Bell*, 529 P.3d at 455.

The reasoning of *Bell* is sound, and we follow it. Evaluated in light of its

reasoning, Raymond Bell's is a particularly weak challenge. Since prospective jurors

were instructed before voir dire questioning began to lower their masks when speaking,

defense counsel was prevented from seeing only the lower faces of venire members who

were not speaking, but listening. The *constitutional* concern is with "for cause"

challenges, and it is hard to imagine that a venire member's frowning, grimacing,

smiling, or laughing that was revealed only by their lower face, while listening to others,

would support a challenge for actual bias.

It is also the case that safety concerns were very real at the time and place of

Raymond Bell's trial. This was demonstrated by defense counsel's own request for

additional alternate jurors and the ability to excuse for cause a juror whose ability to

focus on the evidence would be impaired by pandemic-related concerns. As pointed out

in the record made by the trial court, Spokane County had a low vaccination rate and was

18

experiencing high numbers of Delta variant cases and hospitalizations. Like the trial court in Division One's *Bell* decision, the trial court in this case did not abuse its discretion by requiring jurors to wear face masks during jury selection.

II.     NO TRIAL COURT ERROR IS IDENTIFIED BY MR. BELL'S SECOND ASSIGNED ERROR

Mr. Bell's second assignment of error is that "[e]videntiary and constitutional error . . . occurred" when the jury heard a statement from Detective Lebsock that Mr. Bell characterizes as "intoxication does not matter to Mr. Bell's guilt." Appellant's Opening Br. at 1. What occurred was that after the detective answered questions about how he evaluates the possibility that a suspect has a valid defense against a charge (and specifically, a defense of self-defense), the prosecutor's next question and the beginning of an answer drew an objection:

> Q.     And then what about intoxication, does that ever play into your analysis?
>
> A.     So our role is to look at the law the way the law is written, and, really, intoxication is not—
>
> [DEFENSE COUNSEL]:  Objection, Your Honor. This is law that the judge is going to be instructing on, not testimony of this witness.
>
> THE COURT:  Right. If we could shift to a different . . .
>
> [PROSECUTOR]:  Will do.

2 RP at 293. As can be seen, the question was never fully answered, and the defense objection was sustained. There was no motion by defense counsel to strike the partial answer. The State makes these points in its response brief.

19

In reply, Mr. Bell baldly asserts that no one "was under any illusion that Officer Lebsock's opinion was one that mocked the idea that intoxication was pertinent to wrongdoing," that the partial statement was "improper opinion testimony on guilt," and that it was "manifest constitutional error." Reply Br. at 9-11. None of these contentions is adequately explained. We reject all of them.

Given his decades of law enforcement work, Detective Lebsock could have been familiar with how the jury would be instructed, and he might have been about to say something like, "intoxication is not something that automatically relieves a person of criminal responsibility, but it can be relevant to whether he acted with intent."[5] Of course, if the detective was about to testify to whether intoxication was a defense, or how, then anything he had to say would be objectionable. The objection was properly sustained.

Defense counsel could have asked the court to strike the partial answer and instruct jurors that they would receive their instruction on the law from the court.[6] The

---

[5] The jury was later instructed by the trial court's instruction 23, "No act committed by a person while in a state of voluntary intoxication is less criminal because —by reason of that condition. However, evidence of intoxication may be considered in determining whether the defendant acted with premeditated intent and/or intent." 2 RP at 368.

[6] Before its deliberations, the jury was instructed, "It is also your duty to accept the law from my instructions regardless of what you personally believe the law is or what you think it should be. You must apply the law from my instructions to the facts that you

20

court was not required to do either, because the defense did not ask it to. *E.g.*, *State v. Severns*, 19 Wn.2d 18, 20, 141 P.2d 142 (1943) (appellant did not see fit to move to strike at trial, and could not complain on appeal); *accord State v. Gallo*, 20 Wn. App. 717, 728, 582 P.2d 558 (1978) (citing *State v. Jones*, 70 Wn.2d 591, 424 P.2d 665 (1967)). No error by the trial court is shown.

III.     THE EVIDENCE OF FIRST DEGREE ASSAULT WAS SUFFICIENT

Mr. Bell's third assignment of error is that the evidence was insufficient to support the jury's verdict that he was guilty of first degree assault, and specifically insufficient on the element of intent. In reviewing a challenge to the sufficiency of the evidence, we view the evidence and all reasonable inferences in a light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences that a trier of fact can draw from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and

decide have been proved and in this way decide the case," 2 RP at 356, and later, "The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions." *Id.* at 358. Jurors are presumed to follow the court's instructions. *State v. Kalebaugh*, 183 Wn.2d 578, 586, 355 P.3d 253 (2015).

the persuasiveness of the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850

(1990), *abrogated in part on other grounds*, *State v. Crossguns*, 199 Wn.2d 282, 505

P.3d 529 (2022).

To convict Mr. Bell of first degree assault, the State was required to present

evidence that with the intent to inflict great bodily harm, he assaulted Ms. Delcambre

with a deadly weapon. RCW 9A.36.011(1)(a). "Great bodily harm" means "bodily

injury which creates a probability of death, or which causes significant serious permanent

disfigurement, or which causes a significant permanent loss or impairment of the function

of any bodily part or organ." RCW 9A.04.110(4)(c). Evidence of intent to inflict great

bodily harm "'is to be gathered from all of the circumstances of the case, including not

only the manner and act of inflicting the wound, but also the nature of the prior

relationship and any previous threats.'" *State v. Ferreira*, 69 Wn. App. 465, 468-69, 850

P.2d 541 (1993) (quoting *State v. Woo Won Choi*, 55 Wn. App. 895, 906, 781 P.2d 505

(1989)). "Specific intent cannot be presumed, but it can be inferred as a logical

probability from all the facts and circumstances." *State v. Wilson*, 125 Wn.2d 212, 217,

883 P.2d 320 (1994).

Mr. Bell points to the evidence that he had experienced blackouts in the past and

that he had been up for four days, drinking and smoking crack cocaine, to argue that the

jury could not have found he was "capable of desiring and purposefully trying to achieve

the outcome of great bodily harm." Appellant's Opening Br. at 30. A further reason he

22

argues the jury could not find that he acted with the specific intent to harm Ms. Delcambre was because "[t]here was no showing of prior threats or altercations, or enmity between the two." *Id.* at 31. This was a plausible defense theory, and it was reasonable for Mr. Bell to argue that he lacked the required specific intent based on the evidence he identifies. But the State presented countervailing evidence and argument.

Mr. Bell's testimony and that of Ms. George that he was in a blackout state and did not know what he was doing could have been viewed by the jury as biased and self-serving. The jury could view police officers who dealt with Mr. Bell immediately after the assault as more reliable witnesses to his condition. While the officers agreed that Mr. Bell appeared intoxicated, they described him as not requiring medical intervention for his intoxication and as fully able to cooperate with instructions, perform physical tasks, and communicate with the officers. Officer Yinger was one of the first two officers to arrive at the apartment building in response to the 911 calls, encountering Mr. Bell in the first-floor hallway on entering the building. Asked by the prosecutor whether Mr. Bell appeared "vacant," or "blank," as described by Ms. George, Officer Yinger answered, no to both questions. 2 RP at 200.

The jurors were presented with evidence that decades earlier, while in high school, Mr. Bell had been friends with Ms. Delcambre, and before the night of the assault nothing had happened to alter their relationship. More compelling to jurors, however, could have been that on that March evening, Mr. Bell had been dressed down by Ms.

Delcambre, had responded by telling her to be quiet, had told her to "[g]et the 'F' out of my house," 2 RP at 40, and, after fighting with her physically without his machete, retrieved the machete, returned, and unsheathed it. Those facts, the severity of the injuries inflicted, Ms. Delcambre's testimony, and even Ms. George's description of Mr. Bell "chopping and chopping" at Ms. Delcambre, 2 RP at 43, was ample evidence from which to find the required specific intent.

IV.    MR. BELL'S STANDARD RANGE SENTENCE IS NOT APPEALABLE

Mr. Bell's final assignment of error is that the court erroneously deemed the facts he identified as supporting an exceptional sentence not to be compelling. He acknowledges that by statute, a sentence within the standard range shall not be appealed. But he argues that we should treat his case as presenting an exception that exists for "categorical refusals" to impose such a sentence. He asks us to "deem" the court's findings that Mr. Bell's case for mitigation was not compelling as "a categorical statement that the factors could not support a sentence below the standard range." Appellant's Opening Br. at 36.

The fixing of legal punishments for criminal offenses is a legislative function, and includes the power of the legislature to provide a minimum and maximum term within which a trial court can exercise discretion. *State v. Ammons*, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 (1986) (citing *State v. Le Pitre*, 54 Wash. 166, 169, 103 P. 27 (1909)). The power of the legislature in this respect "'is plenary and subject only to

24

constitutional provisions against excessive fines and cruel and unusual punishment.'" *Id.*

(quoting *State v. Mulcare*, 189 Wash. 625, 628, 66 P.2d 360 (1937)).

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, provides that

"[t]he court *may* impose a sentence outside the standard sentence range for an offense if

it finds, considering the purpose of this chapter, that there are substantial and compelling

reasons justifying an exceptional sentence." RCW 9.94A.535 (emphasis added). It

provides that "[t]he court *may* impose an exceptional sentence below the standard range

if it finds that mitigating circumstances are established by a preponderance of the

evidence." RCW 9.94A.535(1) (emphasis added). It provides a nonexclusive list of

mitigation circumstances, one being that "[t]o a significant degree, the victim was an

initiator, willing participant, aggressor, or provoker of the incident." RCW

9.94A.535(1)(a).

RCW 9.94A.585(1) provides that "[a] sentence within the standard range . . . for

an offense shall not be appealed." As a matter of constitutional avoidance (given the

constitutional right to appeal in criminal cases)[7], the Supreme Court held in *Ammons* that

the provision "only preclud[es] appellate review of challenges to the amount of time

imposed when the time is within the standard range," and "[w]hen the sentence given is

within th[at] . . . range, then as a matter of law there can be no abuse of discretion."

---

[7] Article I, section 22 of the Washington Constitution provides, in part, "In criminal prosecutions the accused shall have . . . the right to appeal in all cases."

*Ammons*, 105 Wn.2d at 182-83; *accord State v. Delbosque*, 195 Wn.2d 106, 126, 456 P.3d 806 (2020). A trial court abuses its discretion when it refuses categorically to impose an exceptional sentence below the standard range under any circumstances or consider it for a class of offenders—both are, effectively a failure to exercise discretion. *Id.* Another example of an impermissible basis for denying such a sentence occurs where the court operates under the mistaken belief that it lacks discretion. *State v. McFarland*, 189 Wn.2d 47, 56-57, 399 P.3d 1106 (2017). In cases in which an impermissible basis for refusing to impose such a sentence is found, it is because the appellant is able to point to evidence in the record that there was or could have been a categorical refusal or a misapprehension by the court of its discretion.

Mr. Bell does not point to any evidence that the trial court categorically refused to consider the theories of mitigation he advanced, or that it misapprehended its discretion. The court's decision denying an exceptional sentence reveals that it was complying with RCW 9.94A.535's requirement that to impose a sentence outside the standard range, it must "find[ ], considering the purpose of [the SRA], that there are substantial and compelling reasons justifying an exceptional sentence." The court explained:

> That body camera was some of the most horrific images I've ever seen. I appreciated the fact that you demonstrated remorse. And I actually believe it was genuine, as opposed to playing up to the jury, because it is so disturbing to watch.
>
> . . . .

26

. . . As it relates to the request for a downward, the aging out of criminal behavior, unfortunately, the past speaks for what you've done. And most folks age out before they're 55. They're not doing this when they're in their mid 50s. So that's not a particularly compelling argument for me.

With release motivating—potential for an early release motivating you for an opportunity to improve yourself, as I went through the prior convictions, they sort of graduated in severity instead of taking the advantage of being out and not committing further crimes. And probably a good example of that is why I respectfully disagree with you on the washing out of the juveniles, because you couldn't go five consecutive years without being convicted of another crime. And that's problematic.

It's also problematic that you were on probation at the time, because the whole point of probation is serving your sentence outside the prison walls, so to speak, even though it's a misdemeanor, to help people so that they can stop—they can fix whatever's going on that's making them make bad choices.

So I don't think that any of the mitigating circumstances support a substantial or a compelling reason to justify an exceptional downward.

. . . .

And I agree that the criminal—excuse me, the court system, I believe Ms. Delcambre said it, it's not just, especially for people of color. And you do have to kind of wonder what it would be like if that weren't the case. So that's factoring into my mind too.

I'm also taking into account—because I'm sure—I believe you when you say you didn't intend to do that. I don't think you intended to try to kill her or cut off her hand. So I think that, when you're sober, you probably are a really good guy who has a lot of potential. And I hope that you take advantage of that.

Unfortunately, I get to see people at their worst. But I am taking into account that there is some potential for you, especially—in my box that I have to work with, it's a very lengthy sentence. And I'm well aware of that. In taking into consideration your age, starting at—what I do is I look at the midpoint, which is 242 months, and then sort of say, Okay, are there things that go either way, up or down. One of the things that doesn't go down for me is that there was evidence at trial that the ruckus, for lack of a

27

better word, in the living room had ceased and that it was the coming back that did it. Sort of like whatever beef you had with Ms. Delcambre stopped, and then it was a light switch, and I believe "going ballistic" was the testimony.

And I know Ms. George has been supportive of you, and I understand that, but I remember her testimony in particular when she talked about how you kept chopping. And certainly, the crime scene was consistent with that. So that sort of puts it out.

And like I said, that was one of the most horrific body-worn cameras that I had seen. Frankly, I was surprised—I had no idea that Ms. Delcambre's hand was able to be reconnected after looking at the pictures. So when she came in to testify, I was, frankly, kind of surprised that she had a hand there. So this was a horrific, horrific situation. So that moves it up from the midrange.

So I am imposing 250 months with the 24 months of—based on the deadly weapon enhancement.

And I know that you folks—there's never enough time that's going to make you whole or make you unsee what you saw, but I am taking into account your age. It's a significant sentence for a significant crime.

2 RP at 470-74.

Mr. Bell's argument that the court's finding that his reasons were not compelling is a "categorical refusal" would make the denial of an exceptional sentence appealable in every case. His arguments on appeal are foreclosed by RCW 9.94A.585(1).

V.    SUPPLEMENTALLY ASSIGNED ERROR TO VICTIM PENALTY ASSESSMENT

Following the effective date of Engrossed Substitute House Bill 1169, which was passed by the Washington Legislature in its 2023 regular session, Mr. Bell requested leave to file a supplemental assignment of error to the sentencing court's imposition of the $500 victim penalty assessment provided by former RCW 7.68.035(1)(a). The bill

28

adds a new subsection (4) to the statute, which provides, "The court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1. The record reflects that the sentencing court found Mr. Bell to be indigent. He is entitled to the benefit of the change, which became effective while his case was pending on appeal. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018). We granted Mr. Bell leave to assign error to the assessment, and we will remand to the trial court with directions to make the ministerial correction striking the assessment.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of "additional grounds" (SAG), Mr. Bell raises four.

*SAG 1: Inferior Degree Instruction*

Mr. Bell's jury was instructed on the inferior degree offense of second degree assault.[8] Citing *State v. Coryell*, 197 Wn.2d 397, 483 P.3d 98 (2020), and *State v. Foster*, 91 Wn.2d 466, 589 P.2d 789 (1979), Mr. Bell argues that "[w]hen a crime has been proven against a person and there exist[s] a reasonable doubt as to which of the 2 or more degrees he or she is guilty, he or she shall be convicted only of the lowest degree." SAG at 2. Those cases discuss when a defendant is entitled to an inferior degree

---

[8] The court's instructions defined second degree assault, identified its elements, and told jurors, "The defendant is charged in Count II with first-degree assault. If, after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of second-degree assault." 2 RP at 368 (Jury Instruction 24).

instruction and the notice required to subject a defendant to conviction of an inferior degree offense. *See Coryell*, 197 Wn.2d at 400 ("This case concerns the test to be applied when determining whether to instruct the jury on a lesser included or lesser degree offense."); *Foster*, 91 Wn.2d at 471-73 (holding defendant had sufficient notice, in light of the charging documents and jury instructions).

Since Mr. Bell's jury was instructed on second degree assault, his SAG argument appears to be, in substance, an argument that substantial evidence does not support the verdict that he was guilty of first degree assault. That argument was adequately presented by Mr. Bell's counsel, and we have rejected it. *See* RAP 10.10(a) (SAGs are to be addressed to matters not adequately addressed by counsel's brief).

*SAG 2: Violation of CrR 4.7*

Mr. Bell argues that CrR 4.7 was violated because he did not receive any paperwork on his case until 30 days after the third omnibus hearing. "CrR 4.7 is a reciprocal discovery rule that separately lists the prosecutor's and defendant's obligations when engaging in discovery." *State v. Blackwell*, 120 Wn.2d 822, 826, 845 P.2d 1017 (1993). Under CrR 4.7, prosecutors have "a duty to disclose and to preserve evidence that is material and favorable to the defendant." *Id.* "If the State fails to disclose such evidence or comply with a discovery order, a defendant's constitutional right to a fair trial may be violated; as a remedy, a trial court can grant a continuance, dismiss the action, or enter another appropriate order." *State v. Barry*, 184 Wn. App. 790, 796, 339

30

P.3d 200 (2014). To support a motion to dismiss based on a discovery violation, a defendant must show not only that the State failed to act with due diligence and withheld material facts, but also that the discovery violation "'essentially compelled the defendant to choose between two distinct rights': the right to a speedy trial and the right to adequately prepared counsel." *Id.* at 797 (quoting *State v. Woods*, 143 Wn.2d 561, 583, 23 P.3d 1046 (2001)).

While Mr. Bell is not required to reference the record in an SAG, he must "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). He does not; nevertheless, we identified two points in the record where Mr. Bell complained to the court about delayed discovery. In December 2019, he complained about not receiving discovery from his attorney, who he was asking the court to replace:

> THE DEFENDANT: . . . Well, I haven't received no discovery, no—none of my paperwork's—since I been here nine months, I haven't received no police reports, no discovery, no kind of papers from them, even to come at me with any kind of offer. And I just feel that I need a new attorney to represent me.
>
> [THE STATE]: And, Your Honor, for clarification, I did sign off on an agreed order for—to provide redacted police reports to Mr. Bell. That was at Mr. Zeller's request. Mr. Poston, I think, had initially asked for that, but then he left the public defender's office and the case had to be reassigned. So that should be provided to Mr. Bell with the proper order that says that he can't, you know, take back to his cell and whatnot. And we have made an offer to Mr. Zeller. Mr. Poston and I didn't even get that far as far as negotiation.

2 RP at 8-9. Five months later, and well more than a year before his October 2021 trial,

Mr. Bell presented another motion to replace his counsel and repeated similar discovery

grievances:

> THE DEFENDANT: I'm here today to exercise my constitutional
> rights to address the Court regarding this injustice inflicted upon me during
> these judicial proceedings. Time after time I have been stonewalled in my
> attempts to be involved in my case. I have been denied proper access to the
> last evidence against me and adequate counsel to represent me.
>
> . . . .
>
> On November—on November 22nd my attorney tried to persuade
> me to take a plea offer because the prosecutor gave me a two-week
> deadline. My last omnibus hearing was on 10/25/2019, trial readiness call
> on November 4th, 2019. I have not received a police report, affidavit of
> facts, bill of particular, or discovery. I got a speedy note on December 4th
> of 2019 saying I would be getting ready active police report. That's a
> violation of my Criminal Rule 4.7 discovery and a violation of my
> constitutional rights to a fair trial. Conflict of interest, effective
> assistance—ineffective assistance by counsel, refusal to help me correct my
> offender score history because I pointed out in my juvenile records, 1984, I
> have been walking through it, he won't correct it. And I'm—I've been
> asking him to fix it. . . .
>
> . . . .
>
> MR. ZELLER: . . . We got Mr. Bell's police reports that he
> requested, I believe, in December of 2019. There's a protective order on
> them, but they should be at the jail for him to access if he needs those.

3 RP at 4-6, 9.

Nevertheless, we find no evidence that Mr. Bell ever filed a motion seeking a

remedy for an alleged violation of CrR 4.7, and he fails to identify resulting prejudice.

Any issue is unpreserved. RAP 2.5(a).

32

*SAG 3: Prosecutorial Misconduct*

Mr. Bell next argues that the prosecutor committed misconduct by trying to force a plea deal in October 2019 and that its amendment of the information in February 2020 to add the attempted first degree murder charge was "improper," as "[o]vercharging." SAG at 4-6.

The history and nature of plea negotiations is not reflected in the record. If Mr. Bell has evidence to support a tenable claim that the prosecutor committed misconduct in making the plea offer, his remedy is to seek relief by a personal restraint petition. *See State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

As for the amendment to the information, under CrR 2.1(d), "[t]he court may permit any information or bill of particulars to be amended at any time before verdict or finding if substantial rights of the defendant are not prejudiced." It is not evident if Mr. Bell ever argued that his substantial rights were prejudiced when the amendment was made. As for overcharging, we note that at least some of the jurors were prepared to find Mr. Bell guilty of the attempted murder charge.

We decline review because the nature and occurrence of the alleged errors are not clearly identified. RAP 10.10(c).

*SAG 4: Ineffective Assistance of Counsel*

Finally, Mr. Bell claims that he received ineffective assistance of counsel on four occasions: (1) when counsel refused to argue wash-out for his juvenile convictions and

33

tried to persuade him to enter a plea agreement, (2) when counsel failed to provide discovery in a timely manner, (3) when counsel "refuse[d] to work with me" at a trial readiness hearing, and, (4) when counsel told him to "be quiet and let the prosecutor amend an improper amendment." SAG at 4, 7-8. The claim of ineffective assistance is based on factual allegations outside the record. If Mr. Bell has evidence to support his allegations, and can demonstrate the required prejudice, he may seek relief by a personal restraint petition. *See Norman*, 61 Wn. App. at 27-28.

Mr. Bell's judgment and sentence are affirmed, with the exception of the assessment of the $500 victim penalty assessment. We remand to the trial court with directions to make the ministerial correction striking the assessment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.P.T.

WE CONCUR:

_____          _____
Lawrence-Berrey, A.C.J.                              Pennell, J.